ATTORNEY FOR APPELLANT
Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court



_____

No. 28S00-1305-LW-327

RANDY L. KNAPP,

*Appellant (Defendant),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff).*

_____

Appeal from the Greene Circuit Court, No. 28C01-1108-MR-1
The Honorable Erik A. Allen, Judge

_____

On Direct Appeal from a Sentence of Life Imprisonment Without Parole

_____

**June 12, 2014**

**Rush, Justice.**

Randy L. Knapp appeals his conviction for murdering Stacey Lawson and his sentence of life imprisonment without the possibility of parole ("LWOP"). He challenges the admission of crime scene photographs and an expert witness's reliance on those photographs, the denial of his motion for mistrial, and the preliminary jury instructions in the penalty phase of his trial. He also contends that his LWOP sentence is supported by insufficient evidence, unconstitutionally based on un-charged, non-statutory aggravators, and either unconstitutionally disproportionate or inappropriate under Indiana Appellate Rule 7(B). We affirm in all respects.

**Facts and Procedural History**

Defendant was a *de facto* stepfather to Jeffrey Sims (having lived with Sims' mother for a number of years). Both men were methamphetamine addicts, and were living in a house (and living off of money) Sims had inherited. But in early August 2011, Sims committed suicide after his then-girlfriend—victim Stacey Lawson—broke up with him. Defendant blamed Lawson for Sims' death, and his anger and grief intensified after Sims' family excluded him from a memorial service and blocked his access to Sims' finances. Ever since Sims' death, he had been trying unsuccessfully to find (or at least contact) Lawson.

On August 19, 2011, he was able to contact her and make arrangements to meet her on the pretext of having money that Sims left for her. Before meeting her, Defendant told one person that he was "going to kill that bitch," and left a voicemail for another detailing his plans: "I'm gonna go meet somebody right now. You wouldn't believe who I'm gonna go meet. I won't say over the phone in case something happens." He continued, "I'm f—kin' raged and crazed and I'm gonna see this motherf—ker right now and I might beat her f—kin' brains out." The message concluded:

> I ain't done, and . . . I don't care if I get half of what I want done done, as long as I get half of it done and, and I've done my f—kin' part. But I'm ready to go down, with bullets or whatever. If that's how they want to take me down, I'm ready today to go. . . . I'm headed to Greene County about sixt— [call abruptly drops].

Both people recognized that Defendant was high on methamphetamine, consistent with his own declaration of being "raged and crazed." At about 4:00 p.m., Lawson got into a black Ford Taurus with Defendant, and was never seen alive again.

About twenty minutes after leaving Lawson's home, Defendant called one of his friends and said, "[Y]ou'll never guess who I got with me. . . . [T]he blonde haired bitch that [Sims] was dating. . . . I've got her up at the cemetery out in Newark and I'm going to get to the bottom of this." Defendant continued, "[B]itch[,] say something"—then after a moan or gasp in the background, he said, "I guess she can't speak, talk, she's choking." Later in the day, Defendant left several more incriminating voicemails for that friend—in one, declaring, "It's all comin' together, it's all gonna be fun when it's over. . . . I'm gonna be motherf—kin' laughin' about it. I don't care if I'm in jail or prison, they can all kiss my motherf—kin' ass. . . ." And in another, he stated "It's all over . . . . It's already done, . . . everything done. It's all about satisfaction." Through the rest of the day and the first part of the following day, Defendant told two friends that he had killed Lawson—and to one of

them, smiled as he pantomimed beating her head with a large rock. And while Lawson's boyfriend was searching for her, Defendant lied to him about where they had been.

The next afternoon, Lawson's body was found at a cemetery in Newark, dragged into a wooded area near the gravesite of her 10-year-old brother, who died of cancer in 2008. (A neighbor later came forward, reporting that she had been walking her dog past the cemetery before 5:00 and saw a black car "with large headlights" like Defendant's Taurus backed up to that wooded area.) Lawson had been struck in the head with tremendous force, caving in a portion of her skull and causing a "hinge fracture" at the base of the skull—a type of injury that requires so much force that it usually occurs only in auto accidents, and results in near-instant death. Indeed, her head struck the ground hard enough to leave a divot in the dry August soil beneath her. About the same time as Lawson's body was discovered, Defendant left Walker another rambling, agitated voicemail calling himself "a smart meth-head" who would "plead insanity and blame it all on f—kin' meth."

Police arrested Defendant that same evening. During several interviews conducted intermittently over the course of about eight hours, he admitted picking up Lawson, but claimed he was at his Bloomington home at 4:00 and only picked up Lawson about 9:00 (and not from her home). Defendant said he and Lawson had driven around for awhile, and he then dropped her off at the roadside somewhere. But he admitted having his cell phone with him all day on the 19th and 20th— and when police pointed out that cell-phone location records and his phone's own call history disproved his story and matched Lawson's boyfriend's account, Defendant just insisted the phone records were incorrect. He was charged with Lawson's murder.

At trial, the State's case relied upon Defendant being the last person to see Lawson alive, blaming her for Sims' death, making incriminating statements before, during, and after the murder, and telling police a version of events inconsistent with his own cell-phone records. But the State also presented expert forensic evidence through Dr. Roland Kohr, who had performed Lawson's autopsy—and because his opinion of Lawson's time of death at trial differed from two preliminary opinions he had offered, he was cross-examined extensively (as further discussed below). The jury convicted Defendant of murder, and the case progressed to the penalty phase. The State sought LWOP based on Defendant having been on probation at the time of Lawson's murder, see Ind. Code § 35-50-2-9(b)(9)(C) (2008); the jury recommended LWOP; and Defendant was sentenced accordingly. He appealed directly to this Court. See Ind. Appellate Rule 4(A)(1)(a). Additional details will be supplied where necessary.

## Discussion and Decision

### I. Standards of Review.

Before reaching the merits of this appeal, we address a procedural matter that affects several of the issues Defendant raises. As Defendant acknowledges, there was no timely objection raised at trial to Dr. Kohr's reliance on the crime-scene photographs (Part II.A.2 below), the penalty-phase preliminary jury instructions (Part II.C), or to the State's alleged reliance on improper penalty-phase aggravators (Part III.B). Failure to object at trial waives an issue on appeal unless the appellant can show fundamental error—that is, "an error that ma[de] a fair trial impossible or constitute[d a] clearly blatant violation[] of basic and elementary principles of due process presenting an undeniable and substantial potential for harm." Clark v. State, 915 N.E.2d 126, 131 (Ind. 2009). That exception is "extremely narrow," Benson v. State, 762 N.E.2d 748, 755 (Ind. 2002), and reaches only errors that are so blatant that the trial judge should have taken action *sua sponte*. Brewington v. State, 7 N.E.3d 946, 974 (Ind. 2014); accord Whiting v. State, 969 N.E.2d 24, 34 (Ind. 2012) ("A finding of fundamental error essentially means that the trial judge erred . . . by not acting when he or she should have . . . ."). In sum, fundamental error is a daunting standard that applies "only in egregious circumstances." Brown v. State, 799 N.E.2d 1064, 1068 (Ind. 2003).

By contrast, Defendant's challenges to admission of the crime-scene photos (Part II.A.1) and denial of his motion for mistrial (Part II.B) were properly preserved and therefore do not face the hurdle of fundamental error. But the standard of review is steep nonetheless, requiring Defendant to show that the trial court abused its discretion—that its ruling was clearly against the logic and effect of the facts and circumstances before it. Vaughn v. State, 971 N.E.2d 63, 67–68 (Ind. 2012) (denial of mistrial); Jackson v. State, 697 N.E.2d 53, 54 (Ind. 1998) (evidentiary rulings). The standards of review governing his remaining issues (Parts III.A and III.C.) are more nuanced, and are discussed in greater detail below.

### II. Trial Issues.

#### A. Crime Scene Photographs.

##### 1. *Sufficient foundation for admission.*

Defendant first argues that there was insufficient foundation to admit six crime-scene photos (Exhibits 92, 93, and 97, plus magnified portions of each marked 92A, 93A, and 97A) into evidence

through Dr. Kohr's testimony. Because this issue was properly preserved by trial objection, we review it under the ordinary standard for admission of photographic evidence: abuse of discretion. Pruitt v. State, 834 N.E.2d 90, 117 (Ind. 2005), reh'g denied. Specifically, Defendant asserts that the State failed to sufficiently establish when the photos were taken—the basic fact from which Dr. Kohr formed his final forensic opinion of Lawson's time of death. We find that their time and date were adequately demonstrated, with any remaining uncertainty being only a matter of their weight and not their admissibility.

Generally, a witness authenticates an exhibit by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." Ind. Evidence Rule 901(a). Here, Dr. Kohr testified that he received the three original photos on disc from the Indiana State Police evidence technician who was the photographer at the scene, and created the others by using his computer to enlarge portions of the originals. He further explained that he verified when they were taken based on date and time data encoded within the image files by the camera that took the photos, as his own camera of the same brand also does. But on the stand, he initially stated that the photos were taken on August 19, and had to review the date and time data outside the presence of the jury to refresh his recollection. After doing so, he confirmed that the encoded date and time data reflected that the photos were all taken between 4:00 and 6:00 to 7:00 p.m. on the 20th. The accuracy and reliability of that data depends on whether the camera's time and date were set correctly, but it is consistent with earlier testimony that police arrived at the cemetery between 3:44 and 4:30 on the 20th in response to Lawson's boyfriend's 911 call, and that photos were being taken around 5:25 p.m. Any remaining uncertainty about the date and time of the photos affects only their weight, not their admissibility. The trial court did not abuse its discretion by admitting them into evidence.

Defendant also argues that the photos were inadmissible because Dr. Kohr did not testify they were a true and accurate representation of Lawson's body—an issue the State asserts is waived as insufficiently preserved at trial. Potential waiver notwithstanding, this argument fails because it is based on the wrong type of "foundation." The foundation required for admitting a photograph depends on its use at trial. In most cases, photos are only demonstrative, "visual aids that assist in the presentation and interpretation of testimony"—in which case "testimony . . . that [they] accurately depict the scene or occurrence as it appeared at the time in question" is an adequate foundation. Smith v. State, 491 N.E.2d 193, 195 (Ind. 1986) (citing, inter alia, Torres v. State, 442 N.E.2d 1021, 1024–25 (Ind. 1982) (approving Bergner v. State, 397 N.E.2d 1012, 1017 (Ind. Ct. App. 1979), reh'g denied, trans. denied)).

But other photos—for example, security-camera footage—"are admitted as substantive evidence" as "silent witness[es] as to what activity is being depicted." Smith, 491 N.E.2d at 196. For this "silent witness" purpose, "the foundational requirements . . . are vastly different [than] the foundational requirements for demonstrative evidence." Id. In such cases, "[t]he witness is not required to testify that the photograph is an accurate representation of the scene as it appeared"—and indeed, often could not "so testify since he or she was not necessarily there to observe the scene on that day." Id. (citing Torres and Groves v. State, 456 N.E.2d 720, 721 (Ind. 1983)). Instead, the witness "must give identifying testimony of the scene that appears in the photograph[s]," Smith, 491 N.E.2d at 196, sufficient to persuade "the trial court . . . of their competency and authenticity to a *relative certainty*." Torres, 442 N.E.2d at 1024–25 (quoting Bergner, 397 N.E.2d at 1017) (emphasis original to Bergner). And here, the photos were used for substantive purposes, as "silent witnesses" of mature maggot activity on Lawson's body at the time she was found—which none of the on-scene witnesses addressed, but as discussed below, was the basis for Dr. Kohr's opinion of Lawson's time of death. For that purpose, Dr. Kohr's identification of the photos as the police investigative photos taken between 4:00 and 7:00 p.m. on August 20 was sufficient to show their "competency and authenticity"—and for silent witness purposes, that is all that was required. Defendant's foundation challenge fails.

### 2. *Expert witness relying on the crime-scene photos.*

Defendant also argues that because of uncertainty about when the photos were taken, they were too unreliable for Dr. Kohr to rely on in forming his opinion—an issue raised for the first time on appeal, and therefore reviewable only for fundamental error. But it is well settled that experts may rely on evidence of a type reasonably relied upon in their field of expertise, regardless of its admissibility. Evid. R. 703. Here, it was surely reasonable for Dr. Kohr to rely on the photos' date and time as accurate enough for the assessment he'd been asked to make, since that detail had been established "to a relative certainty" in demonstrating their "competency and authenticity" as discussed above. His reliance on those photos was entirely permissible.

Instead, it appears to us that Defendant's true complaint is with the substance of Dr. Kohr's testimony—an understandable matter, but one that lies beyond the standard of review. Dr. Kohr rendered three contradictory opinions of Lawson's time of death—two before trial and one during his trial testimony. But the change in his opinions was not because of *when* the photos were taken (a factor that remained constant in each of his analyses), but rather because of *what* he perceived in the

6

photos. Dr. Kohr stated that flies in the Greene County area do not lay eggs in the dark, and the eggs take about 18 hours to hatch. He had not initially observed maggots in the August 20 crime scene photos, and thus inferred that Lawson died after sundown on the 19th to explain the absence of maggots. But because that finding was inconsistent with the other evidence, the State asked him to reconsider that finding. In response, Dr. Kohr amended his findings to suggest that Lawson might have been injured before sundown, even if her death did not occur until thereafter. But that was inconsistent with his own autopsy finding of the hinge fracture, which would have caused death almost immediately. At trial, then, Dr. Kohr advanced a third theory after consulting with a forensic entomologist colleague, who suggested reexamining the crime-scene photos under magnification. Dr. Kohr did so, and for the first time noticed large white clusters that appeared to be clumps of mature maggots that he had previously overlooked—and thus inferred that Lawson's death had occurred before sundown on the 19th after all. The reliability of his perceptions on that point went to the weight of his opinion, as tested by cross-examination, and not the admissibility of the photos or of his overall opinion. We find no error, let alone fundamental error.

Moreover, any arguable error in that regard would be harmless, and certainly not fundamental. Even without Dr. Kohr's forensic opinion of Lawson's precise time of death, the remaining evidence against Defendant was overwhelming: his grudge against Lawson, his incriminating statements before, during, and after the murder, a car like his backed up to the woods where Lawson's body was found, and his asserted alibi's inconsistency with his own cell-phone records. Her exact time of death, or the photos' competence to reveal it, had little potential to sway the jury's determination of Defendant's guilt based on the remaining evidence. Again, we find no fundamental error.

## B. Denial of Mistrial as a Sanction for Undisclosed Testimony.

Defendant next argues that Walker's undisclosed testimony that he possibly heard Lawson "gasp" or "moan" after Defendant said, "Bitch, say something," was so prejudicial to require a mistrial. Defendant preserved this issue by timely objection—but still, granting or denying a mistrial is reviewed only for abuse of discretion. Jackson v. State, 925 N.E.2d 369, 373 (Ind. 2010). And "[m]istrial is an extreme remedy in a criminal case which should be granted only when nothing else can rectify a situation." Schlomer v. State, 580 N.E.2d 950, 955 (Ind. 1991). Our deferential review of decisions to grant or deny a mistrial reflects that "the trial court is in the best position to gauge the surrounding circumstances of the event and its impact on the jury." Id.

7

In this case, we do not condone the State's failure to supplement its discovery responses to disclose Walker's additional testimony. The State was aware of that additional testimony a month before trial, but never disclosed it to the defense—and in response to the motion for mistrial, only argued that the testimony was equivocal and of minimal weight, without offering any justification for failing to disclose it. But the additional detail of Walker perhaps overhearing one of Lawson's dying breaths was likely to be particularly compelling to the jury, and thus a particularly damaging fact to keep concealed. Under other circumstances, failing to disclose such a critical fact could readily have been grounds for reversal.

Nevertheless, Walker acknowledged on direct that he had initially thought Defendant's call "was a bunch of BS" and did not take it seriously (since again, he had not yet received Defendant's voicemails from earlier in the day). Then, during a highly effective cross-examination, Walker reiterated that he had never known Defendant to be violent and thought he was only making idle threats; and that his impression of the call was that Defendant was "just messing with" him and that it was Defendant or a TV making the noises. Defense counsel also cast doubt on Walker's veracity, since Walker had never mentioned the choking, let alone any "moan" or "gasp," when he spoke with police. And he elicited Walker's admission that at the time, he was experiencing drug-withdrawal symptoms and "needing drugs really bad"—in Walker's own words, "I was so involved in the drugs at that time all I cared about was getting my drugs."

None of that cross-examination had yet occurred when the trial court denied a mistrial, but it bears out the court's concern that the "extreme measure" of mistrial should only be used when other remedies fail. Here, while avoiding that extreme measure, the trial court offered numerous remedies including "a continuance to conduct [a] deposition or other discovery," a longer recess "to discuss with the witness a little less formally," or to "strike the matter from the record and admonish the jury appropriately"—but defense counsel determined that "perhaps we have a better opportunity at overcoming any harm through further cross examination" instead of those other options. The trial court was in the best position to determine what effect Walker's initial testimony had on the jury, and the likelihood that a less drastic remedy would be effective—and here, it was. Denying Defendant's motion for mistrial was well within the trial court's discretion.

## C. Erroneous Preliminary Penalty-Phase Jury Instructions on Reasonable Doubt.

Next, Defendant asserts fundamental error (again, there was no objection at trial) in the preliminary jury instructions on reasonable doubt for the penalty phase, because instead of reciting

that the State had to prove *the charged aggravating circumstance* beyond reasonable doubt, it repeated the guilt-phase instruction about the "element[s] of the crime" and Defendant's "guilt." Tr. 1393. We review jury instructions "as a whole and in reference to each other," and "error in a particular instruction will not result in reversal unless the entire jury charge misleads the jury as to the law in the case." Whitney v. State, 750 N.E.2d 342, 344 (Ind. 2001) (quoting Edgecomb v. State, 673 N.E.2d 1185, 1196 (Ind. 1996), reh'g denied). And under fundamental error review, Defendant must further show the charge was so misleading as to make a fair trial impossible or blatantly violate basic due process. See Clark, 915 N.E.2d at 131. Here, there is no doubt that the challenged instruction was erroneous, but in view of other correct preliminary instructions on the subject, the overall jury charge was not significantly misleading, let alone enough so to establish fundamental error.

First, only one of the preliminary penalty-phase instructions reflected that error, while other instructions given both before and after the erroneous one framed the issue correctly. One of the very first preliminary instructions correctly stated the State's burden of proving "at least one aggravating circumstance as set forth in the Charging Information" and that the jury may not consider aggravators "other than those specifically charged." Only then was the erroneous instruction given, reciting that the State had to "prove beyond a reasonable doubt that the Defendant is guilty of the crime charged." The court then gave correct instructions on finding mitigating circumstances by a preponderance of the evidence, and concluded with another correct statement about finding the charged aggravator beyond reasonable doubt, closely mirroring the verdict form the jury would ultimately be given:

> You may recommend the sentence of life imprisonment without parole only if you unanimously find: 1. That the State of Indiana has proved beyond a reasonable doubt that at least one of the charged aggravating circumstances exist, and 2. That any mitigating circumstance or circumstances that exist are outweighed by the charged and proved aggravating circumstance or circumstances.

Any potential confusion from the erroneous instruction in the middle was amply mitigated by the correct instructions before and after it.

Furthermore, the penalty-phase witnesses' testimony was quite brief, occupying only eight pages of the nearly 1,500-page Transcript, see generally id. at 1400–08, followed immediately by the parties' closing arguments, see id. at 1409–14. The jury was then briefly dismissed for a "short

break" while the final penalty-phase arguments were settled—which this time, had no oversights in the reasonable-doubt language. The jury therefore had little time outside the courtroom to discuss the evidence with each other under any mistaken view of their penalty-phase function before receiving correct instructions. That, too, significantly mitigates the potential for confusion, at least by comparison to an erroneous guilt-phase instruction that might have misled them for several days before being corrected.

Finally, we observe that the verdict form for recommending LWOP reiterated precisely the correct issue for the jury: "We, the Jury, find that the State of Indiana has proven beyond a reasonable doubt the charged aggravating circumstance" of probation, and "We, the Jury, find that the charged aggravating circumstance that exists outweigh any mitigating circumstances herein." Accordingly, the very act of signing that verdict form would have a tendency to "re-instruct" the jury one more time on the correct issue it was charged to address. In each respect, we do not believe that the overall jury charge as to reasonable doubt was misleading, despite the one incorrect instruction.

The fundamental error standard further cinches that conclusion, in view of the State's efforts to correct that error at the very beginning of its opening argument, immediately after the instructions were read:

> I just want to clarify one of those instructions that the Court read because it is a little confusing. The reasonable doubt instruction that he read to you referenced prov[ing] beyond a reasonable doubt each element of the crime charged . . . . [I]t really doesn't apply to this phase because we have already gone through the first phase and you found the defendant guilty of murder. What it is referencing and what you need to consider is that I must prove to you beyond a reasonable doubt the exist[ence] of the aggravating circumstance, so again we are not having to prove the crime over again in this phase, you just have to find beyond a reasonable doubt that the Defendant was on probation for a felony offense while he committed the murder of Stacey Lawson, so I wanted to clear that up.

We acknowledge that the jury was instructed at the beginning of trial that opening and closing statements "are not evidence," and that jurors "may accept or reject those arguments [as they] see fit"—so that counsel's statement, while correct, may not have carried the same force as if the court had given the instruction correctly. Nevertheless, that clarification was quick, candid, and correct, following right on the heels of the erroneous instruction. And since Defendant's opening statement

10

in no way took issue with it, it is likely the jury would have accepted it at face value. Even if the instructions might otherwise have been misleading, the State's corrective actions were enough to avoid fundamental error.

### III. Sentencing Challenges.

Besides the instructional error addressed above, Defendant raises several issues relating to the substance of his LWOP sentence—that there was insufficient evidence that he was on probation at the time (the only statutory LWOP aggravator the State charged); that the State improperly urged the jury to recommend LWOP based on non-statutory aggravators; that LWOP is "cruel and unusual" or unconstitutionally disproportionate as applied when it is based solely on probationary status for a prior low-level offense; and that LWOP is inappropriate under Appellate Rule 7(B). We address each argument in turn.

#### A. Sufficient Evidence of Defendant's Probation for Methamphetamine Offenses.

Defendant's argument that there was insufficient evidence of his probationary status is unavailing. So far as relevant here, and consistent with our discussion above, seeking LWOP required the State to prove beyond a reasonable doubt that Defendant was "on probation after receiving a sentence for the commission of a felony . . . at the time the murder was committed." I.C. § 35-50-2-9(a), (b)(9)(C). But on appeal, we consider only whether a reasonable factfinder could be satisfied of the matter at issue beyond reasonable doubt, without reweighing the evidence. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007).

Here, the State relied on the testimony of a Bloomington Police Department detective and a Monroe County probation officer to establish Defendant's June 11, 2009 conviction and subsequent sentence for Possession of Methamphetamine and Maintaining a Common Nuisance, both as Class D felonies. The detective testified that Defendant was on probation on the day of Lawson's murder; and the probation officer testified that Defendant's probation would not be complete until November 28, 2013, thus including the date of the murder. Their testimony differed, though, as to the overall length of Defendant's sentence. The detective testified to a sentence of three years, 353 days on the methamphetamine count and three years for the common nuisance count, "all suspended"—not specifying consecutive or concurrent, but implying consecutive because of his specific testimony that Defendant was on probation at the time of the August 19, 2011 murder. By

contrast, the probation officer testified, consistent with a certified copy of the sentencing order she authenticated, that his sentence was three years with 535 days suspended on the first count and a consecutive three years suspended on the second count, for a total of four years, 170 days of non-reporting probation.

Defendant reasons that the discrepancy about the end-date of his probation leaves reasonable doubt about his probationary status. Appellant's Br. at 64. We disagree. By the terms of the statute, the State was only required to prove that Defendant was on probation for a felony "at the time the murder was committed," I.C. § 35-50-2-9(a), (b)(9)(C)—not how much longer thereafter his probation would last. Any discrepancy as to the latter point is immaterial, since there was no dispute about his probationary status on the relevant date. And in any event, a reasonable factfinder could readily conclude that the probation officer's testimony, backed by the sentencing order, was correct and that the detective's uncorroborated testimony to the contrary was mistaken. Viewed either way, the evidence was sufficient for a reasonable factfinder to be persuaded beyond reasonable doubt that Defendant was on probation on the day of Lawson's murder.

## B.   Drug Use and Uncaring Attitude as Uncharged, Non-statutory Aggravators.

Defendant next argues that the State committed prosecutorial misconduct by inviting the jury to recommend LWOP based on non-statutory aggravators—a practice we have held violates the proportionality clause of Article 1, Section 16 of the Indiana Constitution and constitutes prosecutorial misconduct. On this point as well, he raised no timely trial-level objection and must therefore establish fundamental error to prevail. We find no error, let alone fundamental error.

To ensure that imposition of death or LWOP sentences is "proportioned to the nature of the offense" as Article 1, Section 16 requires, "courts must . . . limit the aggravating circumstances eligible for consideration to those specified in" Indiana Code 35-50-2-9, which governs those penalties. Bivins v. State, 642 N.E.2d 928, 955–56 (Ind. 1994) (death penalty); Ajabu v. State, 693 N.E.2d 921, 936 (Ind. 1998) (by statute, "life without parole is imposed under the same standards and is subject to the same requirements" as the death penalty). "[I]t is . . . misconduct for a prosecutor to request a jury to return a death penalty or [LWOP] recommendation for anything other than that the mitigating factors are outweighed by the [statutory] aggravating factor or factors." Cooper v. State, 854 N.E.2d 831, 841 (Ind. 2006). Even when reviewing such claims under the steep fundamental error standard, we have reversed and remanded for a new sentencing hearing when the State's penalty-

phase rebuttal both misstated the law and relied on "drumbeat repetition" of non-statutory aggravators. Id. at 840–41. In Cooper, the State sought LWOP based on the same statutory aggravator as this case: that the defendant was on felony probation at the time of the murder—yet in rebuttal, it urged the jury that it "ha[d] to consider the Defendant's character" and "any aspect of the offense itself" in weighing the charged aggravator against the proffered mitigators of no prior criminal history, acting under extreme mental and emotional stress at the time of the murder, and undue hardship to the defendant's dependent children. Id. at 839–41. There, "[t]he unmistakable theme woven through" the rebuttal was that the defendant deserved LWOP because he was "an unsavory character." Id. at 841. We were "persuaded that the cumulative effect of the prosecutor's remarks" in misstating the law and relying on non-statutory aggravators "hampered the jury's ability to decide dispassionately whether [the defendant] should receive a term of years" instead of LWOP. Id.

But we find no such violation here. The State may not urge LWOP based on non-statutory aggravators, but it is permitted "to state and discuss the evidence and all reasonable inferences to be drawn therefrom" in closing argument, and to "argue both law and facts and propound conclusions based upon [the State's] analysis of the evidence." Lambert v. State, 743 N.E.2d 719, 734 (Ind. 2001) (quoting Potter v. State, 684 N.E.2d 1127, 1134 (Ind.1997)) (internal quotation marks omitted). Indeed, because "the circumstances of a crime often provide 'an appropriate context for consideration of the alleged aggravating and mitigating circumstances,' . . . reference to the nature and circumstances of the crime" is not necessarily improper. Corcoran v. State, 739 N.E.2d 649, 657 (Ind. 2000) (quoting Prowell v. State, 687 N.E.2d 563, 567 (Ind.1997)).

Defendant characterizes the State's closing argument as akin to Cooper, "invit[ing] the jury to weigh [his] continued use of methamphetamine while on probation, his methamphetamine conviction, his failure to seek treatment, and his uncaring attitude" as non-statutory aggravators. But in context, we find it clear that the State was properly advocating the legitimate inference that Defendant's probation for methamphetamine had a material connection to this methamphetamine-fueled murder, even though it was only non-reporting:

> I think it is important to note what the Defendant was on probation for. Yes[,] it was unsupervised probation, . . . but the fact that he had committed the crime of Possession of Methamphetamine and Maintaining a Common Nuisance I think is significant in this case based upon the Defendant's actions and evidence that has been provided to you. *Methamphetamine was at the heart of this case*, he had been

13

convicted of it a couple years prior, *should have sought help for his problem*, didn't seek help for his problem, instead he viciously murdered Stacey Lawson for no reason. Anybody that is on probation *should be walking the line, not committing any offenses*, if it is a drug or alcohol offense, seek out help for your problem, *he didn't do any of those things, he wasn't walking the line, he didn't care*. The evidence showed *he continued to use [m]ethamphetamine* and he murdered an innocent young woman, for that reason I don't believe he should ever be allowed to walk the streets again[. T]hat is why I am asking you[,] make that recommendation [that] he be sentenced to Life Without Parole.

(Emphases added.) The State's references to Defendant's continued methamphetamine use on probation and prior methamphetamine conviction were limited to the proper context of their logical relevance to (and therefore the weight of) the charged statutory aggravator. Similarly, the "uncaring attitude" the State advocated was not in the sense of callousness towards Lawson's life (which would indeed have been improper under Cooper), but rather the proper context of Defendant's attitude toward his probation—the charged statutory aggravator. We find no misconduct in this regard, let alone fundamental error.

A closer call is a sub-issue Defendant raises: that there was no record evidence that he failed to "seek out help for [his] problem" with drugs, so the State's argument in that regard was speculative and beyond the "analysis of the evidence" that Lambert permits. But that reference was only fleeting and indirect—asserting that a probationer "should be walking the line, not committing any offenses, if it is a drug or alcohol offense, seek out help for your problem," and that Defendant "didn't do *any* of those things" (emphasis added). Even assuming *arguendo* that the State's comment on that point was misconduct, the one-time passing reference did not, in context, "place[] the defendant in a position of grave peril" as the standard for prosecutorial misconduct requires, Cooper, 854 N.E.2d at 835—and even less so under fundamental error review. Moreover, the jury was specifically instructed that it was "not permitted to consider any circumstances as weighing in favor of [LWOP] other than the aggravating circumstances specifically charged by the State in the [c]harging [i]nformation," and we presume the jury heeded that charge, Pruitt v. State, 622 N.E.2d 469, 473 (Ind. 1993). Even on this closer issue, Defendant's arguments fail.

## C. Application of LWOP to Defendant's Particular Circumstances.

Last, Defendant challenges his LWOP sentence as unconstitutional, or at least inappropriate under Indiana Appellate Rule 7(B). Though legally distinct, the basic premise of both arguments is

14

much like his penalty-phase argument to the jury: that non-reporting probation for the lowest-level felony is insufficient to justify the second-harshest sentence known to Indiana law. We address each argument in turn.

1. *LWOP as "cruel and unusual" or "disproportionate" as applied to non-reporting probation for low-level offenses.*

In essence, Defendant argues that his non-reporting probation for two Class D felonies was, as a matter of constitutional law, so trivial that using it as the basis for LWOP violates the Eighth Amendment and Article 1, Section 16 of the Indiana Constitution as "grossly disproportionate." The Eighth Amendment's bar on "cruel and unusual" punishments has been held to implicitly prohibit certain "grossly disproportionate punishments." Solem v. Helm, 463 U.S. 277, 288 (1983). But our Constitution by its terms *expressly* requires proportionality: "Cruel and unusual punishments shall not be inflicted. All penalties shall be proportioned to the nature of the offense." We have therefore held that this provision "goes beyond" Eighth Amendment protections, Conner v. State, 626 N.E.2d 803, 806 (Ind. 1993), and permits us "to review the duration of [a] sentence as it is possible for the statute under which [an] appellant is convicted to be constitutional, and yet be unconstitutional as applied . . . in [a] particular instance," id. (quoting Clark v. State, 561 N.E.2d 759, 765 (Ind. 1990)). We thus begin our analysis with the more-protective State standard.

(a) Article 1, Section 16 disproportionality

Though Article 1, Section 16 sweeps somewhat more broadly than the Eighth Amendment, its protections are still narrow. It is violated "only when the criminal penalty is not graduated and proportioned to the nature of the offense," Phelps, 969 N.E.2d at 1021 (citing Conner, 626 N.E.2d at 806). Though we "cannot set aside a legislatively sanctioned penalty merely because it seems too severe," Article 1, Section 16 requires us to review whether a sentence is not only within statutory parameters, but also constitutional as applied to the particular defendant. Conner, 626 N.E.2d at 806. Our standard for an as-applied proportionality challenge depends on the type of penalty at issue. For habitual-offender enhancements, we assess the "nature and gravity" of the present felony, and then the "nature" of the prior felonies on which the enhancement is based, Best v. State, 566 N.E.2d 1027, 1031 (Ind. 1991); while for penalties not based on prior offenses, we have undertaken a simpler inquiry into whether the penalty is "graduated and proportioned to the nature of [the] offense," Conner, 626 N.E.2d at 806 (internal quotation marks omitted). Since the statutory aggravator at issue

15

here relies on Defendant being on probation at the time of the murder, and probation necessarily involves prior criminal history, we apply the same inquiry as for habitual-offender sentences—assessing the nature and gravity of this felony offense along with the nature of the prior felonies underlying Defendant's probation.

Turning to the first prong of Best, Defendant does not (and could not) dispute that the "nature and gravity" of any intentional murder is the gravest offense known to Indiana law and involves the ultimate harm to its victim—a far cry from the D-felony OWIs in Best and Clark, 561 N.E.2d at 766, that caused little to no harm to any person. To the contrary, in both cases, we observed that OWI is generally "classed as a misdemeanor," and was "raised to the lowest class of felony" in those cases only because of a prior OWI conviction. Best, 566 N.E.2d at 1032; see also Clark, 561 N.E.2d at 766. Moreover, we noted in both cases that there was little to no physical injury or property damage involved. Best, 566 N.E.2d at 1032; Clark, 561 N.E.2d at 766. In Clark, that factor was so compelling that we reversed the entire enhancement as disproportionate, without even considering the nature of the prior offenses; 561 N.E.2d at 766; and in Best, we reduced the enhancement from 20 years to 10 because even though the defendant had many prior offenses, they were "non-violent alcohol related offenses, thefts, and burglaries," 566 N.E.2d at 1032. In both cases, the fact that multi-decade sentences were issued for the lowest class of felony (and at that, an offense that is often only a misdemeanor) and involving little or no harm to person or property was vital. The "nature and gravity" of intentional murder is not remotely comparable.

Defendant instead focuses on the second Best prong, arguing that the nature of the offenses for which he was on probation are insufficient to justify LWOP. We disagree. First, the very *fact* of probation is relevant, regardless of the offense on which it is based. Probation by its nature is a matter of grace, imposed in lieu of imprisonment—granted in exchange for the defendant's promise to remain law-abiding during his conditional release. Committing a murder while on probation for any felony offense, even a low-level felony, is therefore a particularly flagrant abuse of that grace and leniency. Moreover, the nature of Defendant's particular offenses works against him. Their relatively minor D-felony classification is offset by involving methamphetamine—the same drug that fueled Defendant until he was sufficiently "raged and crazed" to take Lawson's life, even while serving a probationary sentence intended to let him get help with that addiction. Defendant's issue would arguably present a closer call if the prior offenses for which he was on probation were wholly unrelated to the circumstances of the murder, perhaps akin to the driving-related offenses in Best

16

and Clark. But especially when, as here, there is a distinct nexus between the prior offenses and the present murder, Defendant's sentence is not "so severe and so entirely out of proportion to the gravity of the offenses actually committed as to shock public sentiment and violate the judgment of a reasonable people." Clark, 561 N.E.2d at 765 (quoting Cox v. State, 203 Ind. 544, 559, 181 N.E. 469, 472 (1932)) (internal quotation marks omitted). It therefore readily survives disproportionality review under the Indiana Constitution.

(b) Eighth Amendment "cruel and unusual punishment"

Having disposed of Defendant's Indiana constitutional claim, his Eighth Amendment claim fails for similar reasons. The Supreme Court has rarely held the Eighth Amendment to prohibit LWOP as "disproportional" in any case, and never in any intentional homicide case. "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare," Rummel v. Estelle, 445 U.S. 263, 272 (1980), because in non-capital cases, the Eighth Amendment contains only a "narrow proportionality principle." Ewing v. California, 538 U.S. 11, 20–21 (2003) (internal quotation marks omitted). Applying the closer capital-case scrutiny, the high Court has held the death penalty disproportionate for *vicarious* felony murder— aiding and abetting a robbery in which the accomplices committed murder, but the particular defendant "did not kill or attempt to kill" or otherwise intend to participate in or facilitate a murder. Enmund v. Florida, 458 U.S. 782, 798 (1982). And under the "narrow proportionality principle" for non-capital cases like this, LWOP has been held unconstitutional for certain broad classes of *non-homicide* offenses, such as those committed by juvenile offenders. Graham v. Florida, 560 U.S. 48 (2010).

But only once has the high Court found LWOP disproportionate as applied to a particular offender—and then, only when imposed as a habitual-offender punishment for "uttering a 'no account' check for $100" after a history of comparably petty and non-violent offenses, Solem, 463 U.S. at 279–81. And unlike Solem, Defendant is not just a petty recidivist; he committed an intentional murder. The Supreme Court has recognized that murderers are "categorically [more] deserving of the most serious forms of punishment" than "defendants who do not kill, intend to kill, or foresee that life will be taken," Graham, 560 U.S. at 69—and that "a State is justified in punishing a recidivist more severely than it punishes a first offender." Solem, 463 U.S. at 296. Here, the gravity of murder—coupled with the recidivism demonstrated by committing such a grave offense while still under suspended punishment for a prior felony as Indiana Code section 35-50-2-9(b)(9)(C) contemplates— places Defendant's sentence well within Eighth Amendment bounds.

17

## 2. *LWOP as "inappropriate" under Appellate Rule 7(B).*

In the alternative to his constitutional challenges, Defendant seeks relief under Appellate Rule 7(B), asserting that his sentence is "inappropriate in light of the nature of the offense and the character of the offender." The 7(B) "appropriateness" inquiry is a discretionary exercise of the appellate court's judgment, not unlike the trial court's discretionary sentencing determination. Cardwell v. State, 895 N.E.2d 1219, 1223 (Ind. 2008). On appeal, though, we conduct that review with substantial deference and give "due consideration" to the trial court's decision—since the "principal role of [our] review is to attempt to leaven the outliers," Chambers v. State, 989 N.E.2d 1257, 1259 (Ind. 2013) (citing Cardwell, 895 N.E.2d at 1225), and not to achieve a perceived "correct" sentence, Cardwell, 895 N.E.2d at 1225. This review carries out this Court's general constitutional authority to review and revise sentences under Article 7, § 4 of the Indiana Constitution. Chambers, 989 N.E.2d at 1259.

Applying that standard here, our collective judgment is that LWOP is not inappropriate in light of the nature of Defendant's offense or his character as an offender. The nature of the offense was calculated, premeditated, and brutal. Far from a spur-of-the-moment crime of opportunity, Defendant had been seeking out Lawson for the two weeks since Sims' suicide. Upon finding her, he announced that he "might beat her f—kin' brains out," lured her into the car on false pretenses, dragged her into the woods behind her own brother's gravesite, and then did just what he said he would do, smashing her head with a force normally associated with car crashes. And he did so at her brother's own gravesite—effectively desecrating that site for Lawson's surviving family, who must return to the same spot where their daughter drew her last breath in order to pay their respects to their deceased son. Life without parole is not inappropriate for such an offense.

Defendant's character as an offender is similarly unavailing. While on probation for a previous methamphetamine offense, Defendant made himself "raged and crazed" on methamphetamine to carry out this murder, hoping to "plead insanity and blame it all on f—kin' meth." Before, during, and after the killing, he displayed a brazen and callous character—announcing his plans beforehand, crudely taunting her to "say something" during the murder, and afterwards lying to her boyfriend while he was searching for her, casually telling one friend that "you'll never hear from her again," and reenacting the killing with a smile on his face to another friend. His lengthy criminal history dates back to 1985, and though it consists mostly of drug and alcohol offenses, it also includes a

1995 conviction for three D-felony counts of intimidation and an A-misdemeanor count of battery causing bodily injury. He had been on probation eight times, and violated it four times. And while we acknowledge Defendant's genuine grief over Sims' death, we find it minimally mitigating, because it appears to have been based at least in part on anger at being cut off from Sims' finances. He could have directed his indignation towards methamphetamine and the drug culture that helped bring about Sims' death and Defendant's own probation, but he directed it instead towards exacting brutal revenge. Defendant's character, so far as revealed by this record, also does not make the sentence inappropriate.

## Conclusion

For all the foregoing reasons, we affirm Defendant's conviction for the murder of Stacey Lawson, and his sentence to life imprisonment without possibility of parole.

Dickson, C.J., and Rucker, David, and Massa, JJ., concur.