## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 15 2018, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Joseph K. Etling
Matthew A. Sheehan
Smock & Etling
Terre Haute, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Plaintiff,*

v.

Aaron M. Sullivan,

*Appellee-Defendant*

March 15, 2018

Court of Appeals Case No.
84A01-1709-CR-2113

Appeal from the Vigo Superior Court

The Honorable Michael R. Rader, Judge

Trial Court Cause No.
84D05-1511-F3-2789

**Crone, Judge.**

# Case Summary

[1] After the State charged Aaron M. Sullivan with level 3 felony rape, he filed a motion to suppress the State's video evidence. The trial court granted his motion, and the State appeals, arguing that the trial court's conclusion that the video's authenticity is unsupported by sufficient evidence is contrary to law. Concluding that the evidence and all reasonable inferences arising therefrom do not lead to but one conclusion that is opposite that reached by the trial court, we affirm.

# Facts and Procedural History

[2] In October 2015, Sullivan met nineteen-year-old A.O. On October 9, A.O. and her friend hung out with Sullivan in his apartment. They smoked marijuana together. Sullivan offered A.O. what he represented was Klonopin. A.O. agreed to buy some and ingested it. A.O. and her friend spent the night at Sullivan's. Before going to sleep, A.O. borrowed a pair of black-and-blue plaid pajama pants from Sullivan.

[3] On October 10, 2017, Sullivan's girlfriend Rebecca Latta sent A.O. three video files from her cell phone to A.O.'s cell phone. The same day, A.O. went to a nearby hospital to report that Sullivan raped her. She was examined by the hospital staff and interviewed by Detective Jonathan Vandevender. She gave the police her cell phone, and the police downloaded three video files from A.O.'s cell phone. She also gave the police the pajama pants that she had allegedly borrowed from Sullivan and the underwear that she had worn the

evening before. As part of the investigation, police interviewed Latta. Police obtained a warrant to search Sullivan's apartment but were unable to find his cell phone.

[4] On November 12, 2015, the State charged Sullivan with level 3 felony rape. In May 2017, Sullivan filed a motion to suppress the State's video evidence, arguing that it was inadmissible because the State was unable to authenticate the video files. In June 2017, the trial court held a hearing on the motion and conducted an in-camera review of the video evidence Sullivan sought to suppress, consisting of three video files saved to a CD. State's Ex. 1. The video files depict a close-up view of someone's finger inserted in a woman's vagina and reveal that the woman was wearing a pair of teal and white thong underwear and a pair of black-and-blue plaid pajama pants. The video files do not bear any date or time stamps or other information regarding their origin, do not contain audio, and do not reveal any person's face.

[5] At the suppression hearing, the State introduced the testimony of Latta, A.O. and Detective Vandevender. Latta testified that on October 9, 2015, she went to Sullivan's apartment and found him asleep on the couch and A.O. and her friend asleep in Sullivan's bed. Tr. Vol. 1 at 11-12. Latta had been dating Sullivan for about two years. She recognized his cell phone and took it because she was suspicious. She viewed the two newest video files on Sullivan's cell

phone.[1]  *Id.* at 12.  She sent the videos to her cell phone via text message, but because the files were so large, she split the videos into segments.  *Id.* at 14.  On October 10, 2015, Latta returned to Sullivan's apartment and found him in bed with A.O.  A.O.'s friend was gone.  Latta showed one of the videos that she had retrieved from Sullivan's cell phone to A.O., and A.O. recognized the underwear as her own.  *Id.*  A.O. did not remember the incident.  Latta sent the video, separated into three separate files, to A.O.'s cell phone.  *Id.* at 13-14. Latta believed that when she split the video into three separate files, she had not cut anything out or otherwise altered the video.  *Id.* at 24.  Latta confronted Sullivan with the video.  She testified that he was "very upset[,]" "didn't remember it[,]" and "didn't believe" that the video "was real[,]" that it "was on his phone[,]" or that the man in the video "was him."  *Id.* at 15.  And she testified that Sullivan threatened to kill himself.  *Id.*

[6]     Additionally, Latta testified that she had watched the video files on State's Exhibit 1, but she was "unsure" whether the three video files were from the video files that she had sent to A.O.  *Id.* at 14.  She testified that the quality of the videos was very poor and that she could not testify under oath that the video files on State's Exhibit 1 were from the same video that she saw on Sullivan's cell phone in October 2015.  *Id.* at 20, 26.  She testified that when she viewed the video on Sullivan's cell phone, she was unable to identify any of the individuals in the video and was unable to tell whether it had been sent to

---

[1] When Latta was interviewed by the police, she reported that she had found one video.

Sullivan's phone or produced by it, how long it had been on Sullivan's phone, or the date or location of the video. *Id*. at 21, 25. She testified that the cell phone she had in October 2015 was broken, she no longer had it, and the police had never asked for it.

[7] A.O. testified that on October 9, 2015, she and her friend went to Sullivan's apartment and smoked marijuana with him, and she took Klonopin.[2] She borrowed a pair of black-and-blue plaid pajama pants from Sullivan to sleep in. She testified that from that point she did not remember anything that happened until Latta woke her up the next morning. During the evening of October 10, 2015, Latta called A.O. and told her that she had found a video on Sullivan's cell phone that showed that he had done something to A.O. *Id*. at 29. Latta sent her the video in three parts. *Id*. at 37-38. A.O. testified that she had watched State's Exhibit 1 and that the video files were the same ones that she had received from Latta in October 2015. *Id*. at 30. She testified that it was her underwear in the video and that the pajama pants were the ones she had borrowed from Sullivan the night of October 9, 2015. *Id*. at 30-31. She testified that the underwear she had on were not especially unique but could be purchased at Victoria's Secret. *Id*. at 33. She also testified that the only night that she wore black-and-blue plaid pajama pants was the night that she stayed over at Sullivan's. *Id*. at 39. A.O. testified that her friends had told her that she

---

[2] A.O. testified that she did not drink alcohol that night, but Detective Vandevender testified that when he interviewed her in October 2015, she told him that she had been drinking.

had spent another night with Sullivan before October 9, 2015, but she did not remember it. *Id.* at 35.

[8] Detective Vandevender testified that he viewed the video files in State's Exhibit 1 for the first time after another police officer downloaded them from A.O.'s phone to a flash drive. *Id.* at 45. He testified that he was unable to identify any person in the videos or determine when or where the videos were produced, and could not say whether the videos had been altered from their original state. *Id.* at 48. He also testified that the police department was not in possession of cell phones belonging to A.O., Latta, or Sullivan, and that he "never actually saw [the videos] on a phone." *Id.* at 45. However, he testified that the video files on State's Exhibit 1 were true and accurate copies of the video files he viewed on the flash drive that were downloaded from A.O.'s cell phone in October 2015.

[9] In August 2017, the trial court issued an order granting Sullivan's motion to suppress. The trial court found as follows:

> The Court reviewed the videos offered by the State in camera. ….
> The faces of the persons in the video are not seen. There is no audio. The videos are very small and pixelate when enlarged. The cellphone that originally took the videos is not available.

> The alleged victim in this case cannot identify the male as [Sullivan]. The alleged victim says that the pajama bottoms on the person in the video are the same pajamas she had on that night. The pajamas described allegedly belonged to [Sullivan]. The alleged victim also reports that the underwear on the person in the video are the same underwear she had on that night. She

further reports that the pudenda of the person in the video are shaved. She also shaves her pudenda.

....

On cross-examination, Rebecca Latta admitted that she reported only one video in her deposition taken earlier. She further admitted that she is not sure if the videos are the same as what she saw in 2015. .... She could not identify anyone in the video. She could not determine the date on the video.

In this case no one can say the photographs [sic] were taken on a particular night or in what place. The only link to the alleged victim is her testimony about her underwear and the pajama bottoms, both being mass produced and fungible items of clothing.

In respect to the issue of who took the video images, the Court finds no credible foundation can be established. The videos then must speak for themselves.

This Court finds that it is NOT convinced of the authenticity of the images to a relative degree of certainty. ....

.... Further the clothing in the video is non-descript and fungible. Thousands of such items of clothing are sold every year. There simply is insufficient evidence of the validity and integrity of the video to allow it to be offered in a criminal proceeding.

Appealed Order at 2-3.[3]  This appeal ensued.

## Discussion and Decision

[10]  The State seeks reversal of the order granting Sullivan's motion to suppress, arguing that the trial court erred in finding that the evidence was insufficient to authenticate the video evidence.  When, as here, the State appeals from the grant of a motion to suppress, it "'appeals from a negative judgment and must show the trial court's ruling was contrary to law.'"  *State v. Terrell*, 40 N.E.3d 501, 504 (Ind. Ct. App. 2015) (quoting *State v. Augustine*, 851 N.E.2d 1022, 1025 (Ind. Ct. App. 2006)).  A judgment is contrary to law "'only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that reached by the trial court.'"  *Id*. at 504-05 (quoting *Augustine*, 851 N.E.2d at 1025).  In our review, we consider only the evidence most favorable to the judgment, and we will not reweigh the evidence or judge witness credibility.  *Id*. at 505.

---

[3] After the suppression hearing, the State filed its brief in support of its objection to Sullivan's motion to suppress with affidavits and exhibits.  Sullivan filed a motion to strike the affidavits and exhibits, which the trial court did not rule on.  The State claims that the trial court's silence on the matter indicates that Sullivan's motion to strike was deemed denied.  However, the case that the State cites in support of this claim involved a motion to correct error, and a trial court's ruling on a motion to correct error is specifically governed by Indiana Trial Rule 53.3.  Trial Rule 53.3 does not apply to other motions.  Although the State claims that the trial court relied on the affidavits in its order granting Sullivan's motion to suppress, the State does not direct us to the facts in the order that are based on the affidavits or cite the portions of the affidavits upon which it claims the trial court relied.  We decline to base our review on evidence not relied on by the trial court.  We note that the trial court's decision to suppress the video evidence is a preliminary, pretrial decision.  If the State develops additional evidence to authenticate the video files, such evidence may be submitted to the trial court at trial, at which time the trial court would have an opportunity to reconsider the admissibility of State's Exhibit 1.

Indiana Evidence Rule 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "The foundation required for admitting a photograph [or a video] depends on its use at trial." *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014), *cert. denied* (2015). Photos and videos may be admitted for demonstrative purposes or as substantive evidence. *Id.*; *see also McHenry v. State*, 820 N.E.2d 124, 128 (Ind. 2005) (stating that videotapes may be admitted as substantive evidence). "Demonstrative evidence is evidence offered for the purpose of illustration and clarification." *Underly v. Advance Mach. Co.*, 605 N.E.2d 1186, 1195 (Ind. Ct. App. 1993), *trans. denied*. An adequate foundation for demonstrative evidence requires "'testimony that [it] accurately depict[s] the scene or occurrence as it appeared at the time in question.'" *Knapp*, 9 N.E.3d at 1282 (quoting *Smith v. State*, 491 N.E.2d 193, 195 (Ind. 1986)). Here, however, the State sought to admit the video files as substantive evidence that A.O. was the woman in the video and the fingers were Sullivan's. When photos and videos are offered as substantive evidence, that is, as "'silent witnesses as to what activity is being depicted …. the foundational requirements are vastly different than the foundational requirements for demonstrative evidence.'" *Id.* (quoting *Smith*, 491 N.E.2d at 196) (brackets and ellipsis omitted); *see also Bergner v. State*, 397 N.E.2d 1012, 1017 (Ind. Ct. App. 1979) (adopting silent witness theory).

[12] To establish an adequate foundation for photos and videos that are to be used as substantive evidence, "'[t]he witness is not required to testify that the photograph [or video] is an accurate representation of the scene as it appeared.'" *Knapp*, 9 N.E.3d at 1282 (quoting *Smith*, 491 N.E.2d at 196). Nevertheless, "[f]or evidence to be admitted for that purpose, there must be a strong showing of authenticity and competency, including proof that the evidence was not altered." *McCallister v. State*, No. 87S00-1609-LW-497, 2018 WL 897398, at *5 (Ind. Feb. 15, 2018). To establish an adequate foundation, "the witness 'must give identifying testimony of the scene that appears in the photographs' or the videos sufficient to persuade 'the trial court of their competency and authenticity to a *relative certainty*.'" *Knapp*, 9 N.E.3d at 1282 (quoting *Smith*, 491 N.E.2d at 196 and *Torres v. State*, 442 N.E.2d 1021, 1024-25 (Ind. 1982)). However, our courts have been reluctant to set out "'extensive, absolute foundation requirements.'" *Wise v. State*, 26 N.E.3d 137, 141 (Ind. Ct. App. 2015) (quoting *Bergner*, 397 N.E.2d at 1017).

[13] The State asserts that there was sufficient evidence to lay an adequate foundation for the video files based on the following: A.O. testified that she borrowed a pair of black-and-blue plaid pajamas from Sullivan that night; Latta testified that the video she viewed on Sullivan's cell phone was the most recent video and she found the video the next day; A.O. identified her underwear and the pajama bottoms in the video; and the pudenda in the video was shaved, and A.O. shaved her pudenda. The State posits that "the combination of A.O.'s underwear, Sullivan's pajama pants, and the timing of the video on Sullivan's

cellphone" give rise to only one logical conclusion, that "A.O. was the woman in the video taken the night before and the video accurately depicted Sullivan violating A.O. while she was unconscious." Appellant's Br. at 10. We acknowledge that the *combination* of A.O.'s underwear and Sullivan's black-and-blue plaid pajama pants might support a reasonable inference that A.O. is the woman in the video, but the State was required to establish the competency and authenticity of the video files to a *relative certainty*. *See Knapp*, 9 N.E.3d at 1282. The State contends that the evidence for authentication in this case is similar to that in *Wise*, 26 N.E.3d 137, in which another panel of this Court concluded that video from a cell phone was properly admitted as substantive evidence. We do not agree.

[14] In *Wise*, Wise's wife M.B. found three videos on Wise's cell phone, one showing him having sexual intercourse with her, and two depicting his attempts to engage in oral sex with her. M.B. had no recall of these incidents. She used a handheld video camera to record playback of the videos she found on Wise's cell phone, and she changed the filenames of the videos. The State charged Wise with rape and criminal deviate conduct. By the time of trial, Wise no longer possessed his cell phone. Over Wise's objection, the trial court admitted M.B.'s recordings of his cell phone videos. Wise was convicted.

[15] On appeal, Wise argued that the trial court abused its discretion in admitting M.B.'s recordings because the State had failed to establish an adequate foundation. The *Wise* court disagreed, explaining as follows:

Concerning the integrity of the re-recordings themselves, our review of the record reveals that M.B. testified concerning the circumstances under which she found and recorded the video from the phone. M.B. testified that the phone from which the video was recorded belonged to Wise and that the screensaver on the phone displayed a picture of the couple's daughter. Wise testified at various points that the phone belonged to him or looked like one that belonged to him. M.B.'s renaming of the files did not erase time and date information for the videos; indeed, our review of the video recordings revealed that *the date and time for the videos was displayed* beneath the new names M.B. gave the recordings. *M.B.'s testimony established a chain of custody* for the VHS tape on which she made the recording of the videos from Wise's cell phone, as well as for the DVD onto which a neighbor copied the contents of the tape. *And M.B. testified at trial that the videos played at trial were the same ones she had recorded,* which were in turn in the same condition as she found them when she first played them on October 22, 2008.

Concerning the actual production of the recordings, M.B. testified that *when she told Wise about her discovery, he did not deny that he made the recordings.* Correspondence between M.B. and Wise included Wise's statement to M.B. that she "has the film." Miller, a friend of Wise and M.B., testified that in a phone conversation Wise told her that he had been drugging M.B. for sex and recording his sex acts, and would later watch the videos. And, crucially, *M.B. unambiguously identified herself and Wise as having been depicted in their home in the recordings.*

*Id.* at 142 (citations omitted) (emphases added). Thus, the videos contained time and date information, M.B. testified that the videos at trial were in the same condition as she found them and her testimony established a chain of custody from their source, Wise did not deny making the videos, and M.B.

unambiguously identified the individuals in the videos as herself and Wise and the location of the videos as their home.

[16]     Also instructive is our supreme court's recent decision in *McCallister* affirming the trial court's admission of hotel surveillance video as a silent witness. There, McCallister was convicted of murder and conspiracy to commit murder. A hotel surveillance video depicted the hotel lobby before and after the time of the victim's murder. The surveillance video contained a time-and-date stamp on the bottom-left corner of the video. Shortly before the murder, the surveillance video showed the victim leaving the hotel with three other people. Shortly after the murder, the video showed the same three people returning to the hotel with McCallister but without the victim. On appeal, McCallister argued that the State failed to present an adequate foundation for admitting the surveillance video because the hotel's general manager who authenticated it did not begin working at the hotel until seven months after the murder. Our supreme court found that the State had presented an adequate foundation based on the following:

> Although the manager was not able to say with certainty that the DVD contained accurate footage of the lobby on February 17, he did authenticate it in several important respects. He verified *the time-and-date-stamp system was accurate* and attuned to "standard accepted time" and was reset "in January each year" to ensure accuracy. He "*recognize[d] every piece of furniture and some of the people working*" in the lobby. And he said the *surveillance system is always on, and the videos are backed up to "the cloud*"—meaning they are saved to external servers accessible to the hotel's managers through the internet. These verifications, along with the officer's

> testimony concerning chain of custody, provide sufficient
> grounds for the trial court to have admitted the video.

*McCallister*, 2018 WL 897398, at *6 (emphases added). Thus, there was evidence to establish the time, date, and location of the video as well as a chain of custody from the source of the video.

[17]    The evidence in this case does not compare to that in *Wise* or *McCallister*. The video files in State's Exhibit 1 allegedly came from Sullivan's cell phone and were sent from his phone to Latta's cell phone and then from her phone to A.O.'s cell phone. However, Latta testified that when she watched the video on Sullivan's cell phone in October 2015, she could not determine when or where the video was taken or how long the video had been on his phone, nor could she identify the people in the video. While the evidence might support a reasonable inference that A.O. was one of the people in the video, there is no evidence that identifies Sullivan as the other individual depicted.[4]  In addition, Latta testified that she was unable to confirm that the video files in State's Exhibit 1 came from the video that she saw on Sullivan's cell phone in October 2015 and that she was unsure whether the video files on State's Exhibit 1 were from the video files that she sent to A.O.  Further, we also note that, unlike *Wise*, Sullivan denied any connection to the video when Latta confronted him with it.  Accordingly, we cannot say that the evidence leads to but one

---

[4] In fact, Sullivan was not the only person viewed in bed with A.O. that evening.

conclusion opposite that reached by the trial court. Therefore, we affirm the order granting Sullivan's motion to suppress.

[18] Affirmed.

Robb, J., and Bradford, J., concur.