## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 17 2016, 9:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael Frischkorn
Frischkorn Law LLC
Fortville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Matthew S. Wagoner, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | October 17, 2016 <br><br> Court of Appeals Case No. 30A04-1603-CR-671 <br><br> Appeal from the Hancock Superior Court <br><br> The Honorable Terry K. Snow, Judge <br><br> Trial Court Cause No. 30D01-1506-MR-794 |

**Baker, Judge.**

[1] Matthew Wagoner appeals his convictions for Murder[1] and Level 6 Felony Neglect of a Dependent,[2] arguing that the evidence is insufficient to support the convictions. Wagoner also contends that the sentence imposed by the trial court is inappropriate in light of the nature of the offenses and his character. Finding that the evidence is sufficient and the sentence is not inappropriate, we affirm.

## Facts

[2] In May 2015, Wagoner and Jessica Wagoner were married and had one child together—one-year-old Z.W. Z.W. was fine during the day and night of May 27, 2015, and around 6:45 a.m. on May 28, Jessica left the house for work and left the infant in Wagoner's care.

[3] On the morning of May 28, home care nurse Christina Ferrell stopped at the Circle K gas station in Greenfield at approximately 8:45 a.m. While there, she noticed a man, later identified as Wagoner, with a baby girl. Ferrell noticed that the baby's breathing appeared labored and worried that the infant needed medical attention. She mentioned to Wagoner that the baby did not sound good and asked if he had taken her to the emergency room. He responded (falsely) that he had just done so. Although the weather was warm that day, Wagoner kept Z.W. covered up with a blanket. When the infant moved,

---

[1] Ind. Code § 35-42-1-1.

[2] Ind. Code § 35-46-1-4.

however, Ferrell was able to observe redness around the baby's eyes and red blotches on her legs. Wagoner walked through the hospital parking lot on his way home from the Circle K but did not take Z.W. to the emergency room.

[4] Text messages between Wagoner and Jessica reveal that Z.W. vomited three times that morning, was sleepier than normal, and had "done nothing but moan" during the morning. State's Ex. 52. Wagoner told Jessica that they could not take Z.W. to the doctor because she had three dark lines of bruises on her face. When he walked to Circle K with Z.W., he texted Jessica that "her face looks bad in the sun." *Id.*

[5] Around 9:30 a.m., Jessica called their babysitter, Krista Coffin, asking Coffin to go to Jessica's home immediately because Z.W. was not breathing. Jessica was on her way home from work but Coffin lived closer. When Coffin arrived, Wagoner met her at the door and told her that Z.W. was not breathing and had fallen off the bed. Coffin found Z.W. on the bedroom floor, motionless and blue. Coffin asked Wagoner if he had called 911 and he said, "I can't." Tr. p. 357. Wagoner continued to refuse to call 911, so Coffin took his phone and called 911 herself. Despite repeated attempts to revive Z.W. by Coffin, Jessica, Wagoner, and medical personnel, Z.W. was pronounced dead at the hospital at 10:00 a.m.

[6] Greenfield law enforcement immediately began an investigation into Z.W.'s death. Wagoner told them that the infant had fallen off of the bed while he was changing her diaper. While being transported to the hospital, Wagoner

commented that "he was a piece of shit and he didn't deserve to live." *Id.* at 176. On May 30, Wagoner twice attempted to commit suicide, telling a responding officer that "he was a piece of shit and that he wanted to die." *Id.* at 191.

[7] Z.W.'s autopsy revealed fifty bruises, contusions, abrasions, and scratches on Z.W.'s body. She also had healing fractures. She had sustained recent severe blunt force injury to her head, brain, and abdomen, as well as lacerations to her liver and pancreas and bruises to all of the organs in her abdominal cavity. Both the head and abdominal injuries were sufficiently severe to have caused her death; a fall from a bed would not have caused either of those injuries. The amount of force required to cause the abdominal injuries was similar to that found in deaths due to traffic accidents or falls from second or third story windows.

[8] The injuries to Z.W.'s eyes, face, head, and neck appeared fresh and were most likely inflicted within two to four hours, or as little as thirty minutes, before she died. Z.W. would have lost consciousness from the head injury prior to her death. The laceration of her liver would have resulted in death within two to four hours of the time the injury was sustained. The combination of the head and abdominal injuries would have led to a more rapid deterioration and a shorter time before death. In other words, the major injuries to Z.W.'s head and abdomen would have resulted in her death in, at most, two to four hours.

[9] On June 1, 2015, the State charged Wagoner with murder and Level 1 felony neglect of a dependent. Wagoner's jury trial took place between January 25 and February 2, 2016, and the jury found Wagoner guilty as charged. The trial court reduced Wagoner's Level 1 felony neglect of a dependent conviction to a Level 6 felony conviction based on double jeopardy concerns. The trial court sentenced Wagoner to sixty-five years imprisonment for the murder conviction and to a consecutive term of two and one-half years imprisonment for the neglect conviction, with two and one-half years suspended to probation. Wagoner now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[10] First, Wagoner argues that the evidence is insufficient to support his two convictions. When reviewing a claim of insufficient evidence, we will consider only the evidence and reasonable inferences that support the conviction. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). We will affirm if, based on the evidence and inferences, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009).

## A. Murder

[11] To convict Wagoner of murder, the State was required to prove beyond a reasonable doubt that he knowingly killed Z.W. I.C. § 35-42-1-1. A person engages in conduct knowingly when, at the time he engages in the conduct, he

is aware of a high probability that he is doing so. Ind. Code § 35-41-2-2(b). A defendant's murder conviction may be sustained on circumstantial evidence alone. *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016). Likewise, a trier of fact may infer that the requisite intent for a crime exists based solely on circumstantial evidence: "Knowledge and intent are both mental states and, absent an admission by the defendant, the trier of fact must resort to the reasonable inferences from both the direct and circumstantial evidence to determine whether the defendant has the requisite knowledge or intent to commit the offense in question." *Stokes v. State*, 922 N.E.2d 758, 764 (Ind. Ct. App. 2010) (holding knowledge may be proved by circumstantial evidence, and may be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points).

[12] In this case, the evidence supporting the verdict is as follows:

- Z.W. was in the sole care of Wagoner beginning at approximately 6:45 a.m. on the day of her death.
- Z.W. was pronounced dead at approximately 10:00 a.m.
- The cause of Z.W.'s death was blunt force trauma, stemming from the severe injuries to her head and/or her abdomen.
- Both of those injuries were recent and were inflicted within a short time of Z.W.'s death. At most, those injuries were inflicted two to four hours before her death; at the least, as little as thirty minutes before her death.

Additionally, Wagoner told police that Z.W. sustained the injuries by falling off of the bed. It is not at all possible that her injuries were sustained in that way. *See Grimes v. State*, 450 N.E.2d 512, 521-22 (Ind. 1983) (holding that the jury

may consider a defendant's attempts to provide falsehoods as evidence of consciousness of guilt).

[13] A reasonable jury could have concluded, based upon the above evidence, that Wagoner—the baby's sole caregiver at the time she was fatally beaten—was the perpetrator of her injuries. As to whether Wagoner acted knowingly, we note that a defendant's intent may be inferred from his "conduct and the natural and usual sequence to which such conduct logically and reasonably points." *Stokes*, 922 N.E.2d at 764. In this case, Z.W.'s abdominal injury was caused by such severe physical force that it was comparable to someone killed in a traffic accident or who had fallen from a two- or three-story window and landed on her abdomen. A reasonable juror could infer that an adult male could not strike a small infant in such a manner without understanding that there was a high probability that it would kill her. We agree with the State that "[t]o believe otherwise defies logic and human experience." Appellee's Br. p. 21. We find, based on the evidence in the record, that a reasonable jury could have found beyond a reasonable doubt that Wagoner knowingly killed Z.W. and we decline to reverse on this basis.

## B. Neglect

[14] Next, Wagoner argues that the evidence is insufficient to support his conviction for Level 6 felony neglect of a dependent. The jury convicted Wagoner of Level 1 felony neglect of a dependent, which required the State to prove beyond a reasonable doubt, among other things, that Wagoner was at least eighteen years

old and neglected Z.W., resulting in her death. I.C. § 35-46-1-4. As noted above, however, the trial court reduced the conviction to a Level 6 felony, removing the requirement of proof of Wagoner's age. *Id.*

[15] Wagoner's sole argument with respect to this conviction is that the State did not sufficiently prove that he was at least eighteen when he neglected Z.W. As he was ultimately convicted of and sentenced on a Level 6 felony, however, we need not determine whether the State adequately proved his age.

[16] That said, the State introduced into evidence Wagoner's recorded interview with law enforcement. Wagoner told law enforcement that his date of birth was "5/27/84." State's Ex. 53. Moreover, the jury was presented with a photograph of Wagoner holding Z.W.; from this photograph, the jury could have reasonably inferred that Wagoner was over the age of eighteen when the photograph was taken. State's Ex. 2; *see Rowe v. State*, 867 N.E.2d 262, 266-67 (Ind. Ct. App. 2007) (holding that where a defendant's age is an element of the offense, the jury can infer the defendant's age through observation and circumstantial evidence). Therefore, even if the State were required to prove Wagoner's age to support the neglect conviction, we find that the evidence was sufficient to do so.

## II. Appropriateness

[17] Finally, Wagoner contends that the sentence imposed by the trial court is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that this Court may revise a sentence if it is

inappropriate in light of the nature of the offense and the character of the offender. We must "conduct [this] review with substantial deference and give 'due consideration' to the trial court's decision—since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence . . . ." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[18] For the murder conviction, Wagoner faced a possible sentence of forty-five to sixty-five years imprisonment, with an advisory term of fifty-five years imprisonment. Ind. Code § 35-50-2-3. He received a maximum sixty-five-year term. For the Level 6 felony neglect of a dependent conviction, Wagoner faced a term of six months to two and one-half years imprisonment, with an advisory term of one year. I.C. § 35-50-2-7. He received a maximum two-and-one-half-year term, to be served consecutively to the murder sentence, but fully suspended to probation.

[19] As to the nature of Wagoner's offenses, it is challenging to find words that fully capture the heinousness of his actions. As the parent of Z.W., as well as her sole caregiver on the morning of her death, Wagoner held the ultimate position of trust—and abused that position in a violent, horrifying fashion. Wagoner knew that the infant was having difficulty that morning, as evidenced by his texts to Jessica describing how Z.W. was vomiting, moaning, and acting sleepier than normal, as well as the expressed concern of a fellow customer at a convenience store about Z.W.'s labored breathing. But he did not seek medical

attention because of concerns about the bruising to her face. And when she stopped breathing, he did not call 911. Instead, he texted Jessica. Jessica asked Coffin to run to the house, and when Coffin got there, Wagoner continued to refuse to call 911. Finally, Coffin took his phone and called 911 herself. But by then, it was too late. Wagoner later attempted to conceal his crime by inventing a story that Z.W. had sustained her injuries by falling off of the bed. To say the least, the nature of these offenses does not aid Wagoner's inappropriateness argument.

[20] As for Wagoner's character, he has a criminal history dating back to when he was a juvenile; his history also includes five adult felony convictions and a class A misdemeanor domestic violence conviction. His probation was revoked in almost every single one of these cases. He was on pretrial release for other charges when he committed the instant offenses. Wagoner's character does not persuade us to find in his favor on his inappropriateness argument.

[21] It has often been said that maximum sentences should be reserved for the very worst offenses and the very worst offenders. We do not fault the trial court for finding that this case qualifies. The sentence imposed by the trial court is not inappropriate in light of the nature of the offenses and Wagoner's character.

[22] The judgment of the trial court is affirmed.

Vaidik, C.J., and Najam, J., concur.