FILED

Apr 06 2017, 10:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Aaron D. Murray,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | April 6, 2017<br><br>Court of Appeals Case No.<br>36A04-1608-CR-1841<br><br>Appeal from the Jackson Circuit Court<br><br>The Honorable Richard W. Poynter, Judge<br><br>Trial Court Cause No.<br>36C01-1507-F4-22 |

**Baker, Judge.**

[1] Aaron Murray appeals the sentence imposed by the trial court after Murray pleaded guilty to three counts of Level 4 Felony Child Molesting,[1] arguing that the sentence is inappropriate in light of the nature of the offenses and his character. Finding that the sentence is not inappropriate, we affirm.

## Facts

[2] In 2015, forty-one-year-old Murray was employed as a math teacher at Seymour Middle School. During the 2014-15 school year, Murray was then-twelve-year-old K.B.'s math teacher.[2] Until that school year, K.B. had been an emotionally stable child who was a good student. During the 2014-15 school year, however, K.B. began to experience problems.

[3] At that same time, K.B. became close to Murray, regularly staying after school for help with homework. After it was reported that K.B. was experiencing emotional turmoil, Murray spoke to K.B.'s mother and stated that he and his wife would spend time with K.B. Murray attended the same church as K.B. and her mother, and began sitting with K.B. at church and interacting with her there and at school. Murray also began taking K.B. to concerts and to engage in volunteer work, and he also began inviting her to stay overnight at his house. He regularly sent messages to K.B. and talked with her on the telephone.

---

[1] Ind. Code § 35-42-4-3(b).

[2] The previous school year, Murray had been suspended for at least three months for a previous incident about which there are no details in the record.

[4] In May 2015, Murray began spending even more time with K.B.; often, they spent hours at a time alone together. He began transporting K.B. to counseling sessions and even recommended to K.B.'s parents that they find a new counselor who would allow Murray to sit in on the sessions.

[5] On June 15, 2015, Murray was alone with K.B. at his residence and kissed her. He attempted to use his tongue, but K.B. pulled away, and he apologized. Murray told K.B. that he was attached to her. K.B. later reported that this was her first kiss. A few days later, Murray left on vacation with his wife, and while he was away, he incessantly contacted K.B. through text, video, SnapChat, and Facebook messages. He told her that he loved her, that she was beautiful, that he needed her, and that it would not be long before they could be together again.

[6] On June 28, 2015, Murray returned from vacation and K.B. went to his house to spend the day with him. He kissed K.B. while his wife was in the next room. He confessed what had happened to his wife, and she kicked him out of the house as a result. In the middle of the night on June 29, 2015, K.B. woke her mother and said she was going to talk to Murray outside. K.B. then left with Murray, who drove to a parking lot and began kissing her again—this time more intimately. When K.B. resisted, Murray told her it was okay. He drove her home around 4:00 a.m.

[7] Later that same day, Murray returned to K.B.'s residence with gifts for K.B., again driving her to a parking lot later that afternoon. Eventually, they drove to

an overlook where he kissed K.B., grabbed her breasts, and massaged his hand between her legs outside of her clothes. K.B. was uncomfortable and moved his hand away. He also moved her hand to stroke his penis outside of his clothing. He later told investigators that he "felt he should take it as far as he could with her." Appellant's App. Vol. III p. 24.

[8] K.B.'s friend reported the molestations to K.B.'s parents, who reported it to the police. During their investigation, police officers noted that both Murray and K.B. had the same Facebook profile picture, which was a picture of the two of them. Even after the molestations were disclosed, Murray continued to contact K.B. regularly.

[9] On July 16, 2015, the State charged Murray with three counts of Level 4 felony child molesting. A no contact order was put in place that prohibited Murray from contacting K.B. Notwithstanding the no contact order, while Murray was in jail awaiting trial, he contacted K.B. over fifty times by telephone, totaling over twenty hours of talking time. Among other things, the following conversations occurred in those phone calls:

- Murray told K.B. he loved her each time they talked.
- Murray said that he had "never stood in the kitchen naked making breakfast with anyone before" and that K.B. made him feel comfortable while he was naked. State's Ex. 1.
- Murray discussed watching K.B. run around her house while she was naked.
- K.B. reminded Murray that he had asked her to marry him on her eighteenth birthday and stated that she had purchased decorative license plates to commemorate the engagement.

- Murray told K.B., "I miss making you wet," and later indicated that he was stroking himself while talking to her. State's Ex. 1-2.
- On one occasion, he told K.B., "I just want to strip you naked right now, lay you back and get to work on that p***y." State's Ex. 1.
- Murray stated that he "would rip [K.B.'s] clothes off right now" if he saw her. State's Ex. 2.
- Murray said that he missed getting "head" from K.B. *Id.*
- He described an encounter at his father's car dealership where he made K.B. "wet" and said that employees probably had to "use paper towels to clean that up." State's Ex. 1.
- Murray gave K.B. instructions on how to write him in jail, instructing her to sign her letters with his last name.
- Murray required K.B. to recite vows of love on each phone call and told her that no one could keep him away from her.

On April 13, 2016, Murray pleaded guilty as charged in exchange for (1) the dismissal of charges pending in another case for Level 6 felony residential entry and Class A misdemeanor battery resulting in bodily injury; and (2) the State's agreement not to file new charges on the many violations of the no contact order.

[10] At the June 28, 2016, sentencing hearing, Murray asked the court for an "appropriate sentence," and argued that consecutive terms would not be appropriate because of his lack of criminal history. Sentencing Tr. p. 69. The State requested a sentence of three consecutive ten-year terms, with two years suspended per term, for a total of twenty-four years executed and six years suspended to probation. The trial court sentenced Murray to consecutive nine-year terms for each of the convictions but suspended six of the nine years on

one count, for an aggregate executed sentence of twenty-one years imprisonment. Murray now appeals.

## Discussion and Decision

[11] Murray's sole argument on appeal is that the sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that this Court may revise a sentence if it is inappropriate in light of the nature of the offense and the character of the offender. We must "conduct [this] review with substantial deference and give 'due consideration' to the trial court's decision—since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence . . . ." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[12] Murray was convicted of three Level 4 felonies. For each of these convictions, Murray faced a sentence of two to twelve years imprisonment, with an advisory term of six years. Ind. Code § 35-50-2-5.5. He received nine years on each conviction—slightly elevated above the advisory term but short of the maximum term—and suspended six years of one of the terms to probation. Ultimately, he received an aggregate executed term of twenty-one years imprisonment, far less than the maximum possible term of thirty-six years.

[13] As for the nature of Murray's offenses, he aggressively groomed a twelve-year-old child over the course of a school year, pursuing her not only at school but also at church. He was her math teacher and a leader at church, using those

positions of trust to gain access to her. He was aware that K.B. was having emotional problems and exploited that knowledge to further lodge himself in her life. Murray eventually found ways of being alone with K.B., often for hours at a time. He finally found a way to evolve their relationship into a sexual one, going so far as to drive K.B. away from her house in the middle of the night. Murray stayed in nearly constant communication with K.B., even while vacationing with his wife—and even while incarcerated, in the face of a no contact order.

[14] K.B.'s father stated that K.B. was "broken" as a result of her relationship with Murray. Sent. Tr. p. 53. She became suicidal following all of Murray's phone calls from jail and had to receive inpatient psychiatric care. In fact, at the time of the sentencing hearing, K.B. had been in an inpatient facility for over six months and her family did not know when she would be released. At one point, Murray was aware that K.B. was suicidal but continued to call her and explicitly talk about sex. We do not find that the abhorrent nature of the offenses aids Murray's argument.

[15] As for Murray's character, while it is true that he does not have a prior criminal record, he was facing other criminal charges at the time he pleaded guilty to child molesting. And he repeatedly and aggressively violated the no contact order while incarcerated, calling K.B. over fifty times for a total talking time of over twenty hours, even at a time when he knew she was suicidal. In those calls, he lewdly discussed sexual acts and his own gratification, using subtle and not-so-subtle methods of control to emotionally manipulate the child. Murray

has never taken responsibility for his actions, characterizing the situation as something that "happen[ed] to" him and never apologizing for the harm he caused to K.B. *Id.* at 13. Murray's actions and behavior are repugnant, and we do not find that his character aids his argument. If anything, we believe the trial court exercised admirable restraint in suspending a portion of Murray's sentence to probation. We do not find the sentence inappropriate in light of the nature of the offenses and Murray's character.

[16] The judgment of the trial court is affirmed.

Barnes, J., concurs.
Crone, J., concurs in result with a separate opinion.

| Aaron D. Murray, | Court of Appeals Case No. |
| --- | --- |
| *Appellant-Defendant,* | 36A04-1608-CR-1841 |
| v. | |
| State of Indiana, | |
| *Appellee-Plaintiff* | |

**Crone, Judge, concurring in result.**

[17]  When a criminal defendant requests appellate review and revision of his sentence pursuant to Appellate Rule 7(B), "an appellate court has the power to affirm, reduce, or *increase* the sentence." *Akard v. State*, 937 N.E.2d 811, 813 (Ind. 2010) (emphasis added) (citing *McCullough v. State*, 900 N.E.2d 745, 750 (Ind. 2009)). In light of Murray's egregious betrayals of his positions of trust with K.B., his dozens of depraved phone calls to his emotionally vulnerable victim in violation of a no-contact order, and his utter lack of remorse or acceptance of responsibility, if the State had asked us to impose a harsher sentence, I would have been inclined to grant that request. While the lack of

such a request does not preclude an appellate court's consideration of an upward sentence revision, it is a significant factor. *See id*. at 814 ("Although the defendant's raising of sentence reasonableness on appeal authorizes appellate consideration of whether the assigned sentence is inappropriately stem or lenient, we decline to increase the sentence *here*, particularly in the context of the State's request for no greater sentence at trial and its assertion on appeal that such is an appropriate sentence. These are strong indicators that the trial court sentence is not inappropriately lenient.") (emphasis added). At Murray's sentencing hearing, the State requested a slightly harsher sentence than that imposed by the trial court. But because we must conduct an Appellate Rule 7(B) sentencing review with "substantial deference" and give "'due consideration'" to the trial court's decision, *Knapp*, 9 N.E.3d at 1292, and because the State did not request a harsher sentence in its appellate brief, I reluctantly concur in the result reached by my colleagues.