## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 29 2018, 10:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bruce W. Graham
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lee M. Stoy, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kyle L. Balser, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | August 29, 2018 <br><br> Court of Appeals Case No. 18A-CR-473 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Steven P. Meyer, Judge <br><br> Trial Court Cause No. 79D02-1706-F2-12 |

**Altice, Judge.**

**Case Summary**

Kyle L. Balser pled guilty to Level 2 felony conspiracy to commit dealing in methamphetamine and admitted to being a habitual offender. The trial court sentenced Balser to twenty-five years on the conspiracy conviction and enhanced the sentence by ten years based on his status as a habitual offender. On appeal, Balser argues that his sentence is inappropriate.

We affirm.

### Facts & Procedural History

In 2016, the Tippecanoe County Drug Task Force (the Task Force) started investigating Balser for suspected dealing in methamphetamine and other controlled substances brought to Indiana from Texas and Mexico. In December 2016, Balser and his wife at the time, Corina Smith, were arrested in White County following a police pursuit, and a subsequent search of Balser's truck uncovered $17,500 in cash, several grams of methamphetamine, and a handgun. Following another traffic stop on January 14, 2017, Balser was arrested for possession of ecstasy and oxycodone.

Balser remained in jail after this arrest, but the Task Force continued its investigation. While in jail, Balser maintained contact with Smith and regularly discussed dealing activities. Detective Nathan Lamar listened to hundreds of phone calls that Balser made from jail. Balser primarily made calls to Smith, but also made calls to Amanda Espinoza and others.

[5]    On January 29, 2017, Balser contacted Smith and discussed plans for buying marijuana and methamphetamine from Texas and Mexico to bring back to Indiana to resell. Balser and Smith discussed prices, agreeing to obtain two kilos of crystal meth for $30,000. When the fifteen-minute time limit for this call lapsed, Balser called Smith back and they continued to discuss future deals, including obtaining methamphetamine for $12,000 a kilo because Balser "pay[s] with cash." *Transcript* at 44. During this second call, Balser and Smith talked about contacting Michael "Mad Dog" Dunfee for his help in settling a $20,000 drug debt. Later, Dunfee approached Smith with a plan to steal two trucks, a trailer, and a mini excavator from a fiber optic company. The plan also entailed filling the trucks with stolen tools, guns, and merchandise, and then taking them to Texas to settle the drug debt and pay for most of the drugs to bring back to Indiana.

[6]    On January 30, 2017, Balser and Smith spoke again and Smith informed Balser that the stolen trucks and equipment were damaged on the way to Texas. Balser became angry and told Smith to "shut the operation down." *Id.* at 45. Balser also told Smith that he hoped the men who messed up the plan died. *State's Exhibit 2.*

[7]    On February 17, 2017, Balser again called Smith. During this call, Balser spoke with a dealer, Jaime "Red" Aldree, from southern Texas, who was at Smith's house. Red had brought half a kilo of methamphetamine from Mexico for Smith to sell to satisfy some of the drug debt. During this phone call, Balser negotiated his drug debt with Red, which included acquiring additional

methamphetamine for Smith to sell. At the end of the phone call, Balser told Smith about another package of meth that was being sent to her house. The Task Force intercepted this package in Brownsville, Texas on February 17, 2017, and found over a pound of methamphetamine. On February 20, 2017, detectives searched Smith's home and found several grams of meth. Smith was also questioned, and she admitted that she and Balser had received four to five kilos of meth from sources in Texas and Mexico. On June 29, 2017, the State charged Balser with conspiracy to commit dealing methamphetamine, a Level 2 felony, and filed a habitual offender sentencing enhancement.

[8] Balser called Espinoza on August 24, 2017, and they discussed how to sell crystal meth and how to put money into his jail account to fund his phone calls. On January 9, 2018, two days before his guilty plea in the instant case, Balser called Espinoza. Balser told Espinoza that an individual Espinoza had talked to owed Balser "a bunch of money" and "56 grams of dope." *Id*. at 51. After pleading guilty, but before his sentencing hearing, Balser called Smith (both were incarcerated at the time) and they talked about how Balser was overseeing Espinoza's meth sales and how he was taking advantage of her.

[9] On January 11, 2018, Balser pled guilty to the conspiracy charge and admitted to being a habitual offender. In exchange, the State agreed to dismiss all charges under Cause No. 79D04-1706-CM-2058, as well as a petition to revoke probation under Cause No. 79D04-1503-F6-50. The plea agreement provided that sentencing was at the trial court's discretion within the range of twenty and thirty-five years. On February 1, 2018, the trial court sentenced Balser to

twenty-five years for the conspiracy, enhanced by ten years for his habitual offender status.

## Discussion & Decision

Article 7, section 4 of the Indiana Constitution grants our Supreme Court the power to review and revise criminal sentences. *See Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014), *cert. denied*, 135 S.Ct. 978 (2015). Pursuant to Ind. Appellate Rule 7, the Supreme Court authorized this court to perform the same task. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Per App. R. 7(B), we may revise a sentence "if after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014) (quoting App. R. 7). "Sentencing review under Appellate Rule 7(B) is very deferential to the trial court." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (quoting *Cardwell*, 895

N.E.2d at 1224). Moreover, "[t]he principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp*, 9 N.E.3d at 1292. Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

[12] In order to assess the appropriateness of a sentence, we first look to the statutory range established for the classification of the relevant offense. Balser was convicted of a Level 2 felony, the sentencing range for which is ten to thirty years, with an advisory sentence of seventeen and one-half years. Ind. Code § 35-50-2-4.5. Balser received twenty-five years. For his status as a habitual offender, the court was authorized to sentence Balzer to an additional fixed term between six and twenty years. I.C. § 35-50-2-8(i)(1). The trial court enhanced Balser's sentence by ten years.

[13] We begin with the nature of the offense. Balser brazenly ran a drug enterprise and facilitated the importation of large quantities of methamphetamine into Indiana from Texas and Mexico, and he continued to do so from the county jail following his arrest. At the sentencing hearing, the trial court aptly summed up Balser's actions, stating:

> I have never heard, to the extent that I heard yesterday, of an
> inmate in our county jail trying to operate a drug enterprise out
> of the county jail to the extent that you did. It's amazing. This is

like a bad episode of Breaking Bad. And you may have thought that you were the King Pin or the cool drug pin operating out of county jail, and dealing with all your friends out there in the community and you all thought you had this cool little operation and you're running around parts of kilos of this and parts of pounds of marijuana of that and running – you're stealing . . . cars and vehicles to bring up the resources so that you can run down to Texas or wherever it is to get your drugs to bring it back; this is serious business. This is real life. And you are responsible for trying to bring serious dangerous drugs into this community. And you're responsibility [sic] for brining [sic] all these other people into it and indirectly creating other crimes and dangerous situations out in this community. It's deplorable. I think your actions here have been manipulative, deliberate.

*Transcript* at 69.

[14] With regard to the character of the offender, we note Balser's extensive criminal history that began with a juvenile adjudication for criminal mischief in 2002. Since, he has accumulated thirteen additional misdemeanors, six felonies, and a previous habitual offender determination in 2011. His felonies include convictions for intimidation, criminal recklessness, escape, identity deception, and possession of methamphetamine. Additionally, Balser was convicted of misdemeanor theft and forgery and dealing methamphetamine as felonies after the commission of the instant offense. Balser has received numerous services, including probation, informal house arrest, and secure detention. Despite opportunities for leniency, Balser continued to commit crimes. As a juvenile, Balser had four petitions for modification against him for violating his probation and was unsuccessfully released from juvenile probation. As an

adult, Balser has had fourteen petitions to revoke probation filed against him, with five having been found true. As stated by the trial court, Balser has "a history of showing a lack of authority for the law and a history of showing inability to follow even the easiest conditions of probation or community corrections." *Id*. at 72. Even after pleading guilty in the instant case and with twenty to thirty-five years hanging over his head, Balser indicated his continued disregard for the law by discussing the fact that he was still overseeing Espinoza's methamphetamine sales.

[15] In addition to his criminal history, the State presented evidence at the sentencing hearing as to Balser's gang affiliation with the Aryan Brotherhood. According to Detective Lamar, Balser's jail calls demonstrate that he is still an active member with this gang and, along with his gang-affiliated tatoos, Balser named his dog "Nazi." *Id*. at 54.

[16] Based on the forgoing, Balser has not met his burden of showing that the nature of the offense and his character render his thirty-five year sentence inappropriate.[1]

[17] Brown, J., and Tavitas, J., concur.

---

[1] To the extent Balser also challenges the trial court's finding and weighing of mitigating factors, he fails to present an abuse of discretion analysis separate from his challenge to the appropriateness of his sentence. He has therefore waived this issue. *See Anglemyer v. State*, 868 N.E.2d 482, 490-94 (Ind. 2007), *clarified on reh'g* 875 N.E.2d 218.