

FILED

Aug 08 2023, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Casey Farrington
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Chase Turner, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | August 8, 2023 <br><br> Court of Appeals Case No. 22A-CR-2404 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Sheila A. Carlisle, Judge <br><br> The Honorable Matthew E. Symons, Magistrate <br><br> Trial Court Cause No. 49D29-2107-F5-22234 |

**Opinion by Chief Judge Altice**
Judges Riley and Pyle concur.

**Altice, Chief Judge.**

## Case Summary

Eighteen-year-old Chase Turner was driving a car when two of his passengers, one of whom was Chordae Spearman, fired several gunshots at another car that had just crashed on I-65 in Indianapolis. Turner acknowledged that his group had been following the car, trying to determine whether a particular individual was inside whom they wished to confront about a friend's death, but Turner claimed that the shooting was unplanned and surprised him.

Following a jury trial, Turner was convicted of Level 5 felony criminal recklessness based on accomplice liability. On appeal, he claims that Indiana State Police (ISP) Sergeant Christopher Hanson launched an evidentiary harpoon at trial by testifying that Spearman – an unavailable witness – "gave [a] complete confession of everything." *Transcript Vol. 3* at 110. Turner argues, as he did below, that this placed him in grave peril and that the trial court abused its discretion in not granting his request for a mistrial.

We reverse and remand for a new trial.

## Facts & Procedural History

In June 2021, Turner and Spearman's roommate, Joseph Simmons, was shot and killed at a party. They soon came to believe that Malik Shaw had committed the shooting and was going around town bragging about it. There were rumors that Jaida Sanders was also involved, but Turner did not necessarily believe these rumors and reportedly remained on good terms with Sanders, who had been romantically involved with Simmons before his death.

[5] After waking up around noon on July 11, 2021, Turner received word that a fight was planned at an apartment complex in Indianapolis between Sanders and another female. He and Spearman made their way to that area in Spearman's Ford Fusion, along with their friends Abel Luna and Robert Holmes. They circled the area multiple times to make sure that they were not being set up by Shaw, and then they parked and watched the fight take place in the parking lot. There was a large group present to view the fight, some armed with guns.

[6] After the fight, Sanders, her best friend Dayonna Slaughter, and Slaughter's sister, went inside a nearby apartment. Turner and his friends waited down the road in the Ford, which Turner was driving. They followed Sanders in her Kia Forte when she eventually left with Slaughter in the front passenger seat and Shaw in the back seat.

[7] Sanders stopped at a red light in the left turn lane, preparing to turn onto I-65, and noticed a car with dark tinted windows pull alongside her on the right. When she looked over again, the windows were down and she recognized the car's occupants – Turner, Spearman, Luna, and Holmes. Spearman and Luna then said to the young women, "Who's in the car? And don't lie." *Transcript Vol. 2* at 209. Shaw was ducked down in the back seat, as Slaughter shouted something back to the other car.

[8] When the light turned green, Sanders "hit the gas to get on the freeway" because she was worried that they were going to "get shot at the light." *Id*. at

210. Sanders started to lose control on the ramp's sharp curve and then struck a cement barrier shortly after entering I-65.

[9] Turner was still driving on the ramp when the Kia crashed. Seconds after the Kia came to rest in the middle lane facing oncoming traffic, Spearman and Luna fired several shots as Turner drove by the crash scene, which was on their left. Spearman, from the front passenger seat, fired over the roof of the Ford. Two of his shots went through the Ford's roof, with one bullet passing in front of Turner and exiting his closed driver's side window. Luna fired from the open window behind Turner. Neither Turner nor Holmes fired any shots. Turner kept driving and left the scene.

[10] Although Sanders sustained minor injuries from the accident, nobody inside the Kia was struck by any of the bullets. The Kia had been hit by four bullets, one each in the hood, windshield, driver's door, and rear door. Shaw fled from the scene, while Slaughter remained with Sanders, who was stuck inside the Kia. Slaughter and Sanders reported hearing the shots but not seeing them being fired.

[11] Three days later, Turner was interviewed by ISP officers, as was Spearman. Turner was cooperative and admitted to following the Kia to determine whether the girls were hiding Shaw inside and, if so, to confront Shaw about Simmons's death. Turner repeatedly claimed that the group had no intention of shooting at the Kia, though he knew there were firearms in his car. Turner stated that he believed the first shot, which hit his window, came from the Kia.

Turner said he heard Holmes tell the others not to shoot but that Spearman fired shots with his arm out the window and over the roof and Luna fired from behind as they went past the crash. Turner explained that after the shooting, Holmes was mad that it had happened, and Luna said he shot in response to the bullet hitting the window. According to Turner, Spearman said nothing about the shooting. During the recorded interview, Turner turned over his cell phone and provided the passcode to it.

[12] On July 19, 2021, the State arrested and charged both Turner and Spearman with attempted battery by means of a deadly weapon and criminal recklessness, both Level 5 felonies. As of Turner's jury trial, which commenced August 25, 2022, Spearman had not been tried, and police had been unable to locate Luna. The State chose not to charge Holmes.

[13] The State tried Turner as an accomplice, and the theory of the defense was that Turner did not know that his passengers would fire upon the Kia. The State presented Turner's recorded interview at trial, in which he acknowledged being the driver of the Ford but denied any intention of being part of the shooting. Throughout the interview, an ISP investigating officer, Lieutenant Jeffrey Hearon, warned Turner that they would recover all text messages, calls, and GPS data from his phone and view all social media activity, which accounts had been locked by police. Lieutenant Hearon suggested that such information would reveal discussions that occurred between Turner and his friends before and after the shooting.

[14] On cross-examination of Lieutenant Hearon, defense counsel inquired into the investigation, or lack thereof, regarding cell and social media evidence. Lieutenant Hearon testified that they were "unable to break" the internal encryption of the phone. *Transcript Vol. 2* at 241. On redirect, Lieutenant Hearon explained why he did not access the phone using the passcode provided by Turner and indicated that "based on the witnesses and the other investigation … we didn't think it was necessary to go and get the other social media because we were able to connect those dots as to what happened." *Id*. at 247-48.

[15] Sergeant Hanson also testified about the investigation and indicated that he believed Spearman and Luna were the shooters and that Turner was the driver. He indicated that ISP had interviewed Turner and Spearman but had been unable to locate Luna. As for Turner's phone, Sergeant Hanson testified, "The data system that was on that phone could not be processed through our cyber unit." *Transcript Vol. 3* at 80.

[16] On cross-examination, defense counsel first asked about Holmes, and Sergeant Hanson said that Holmes had been briefly interviewed and denied hearing or seeing anything while in the car. Because it had not been disclosed to the defense that Holmes had been located and interviewed, Turner moved for a mistrial. The trial court reprimanded the State but ultimately denied the request for a mistrial. Later, on cross-examination, Sergeant Hanson testified that although he believed "there was a plan among these kids in the car to do a

shooting," he did not believe there was enough evidence to charge Holmes with anything. *Id*. at 101.

[17] Defense counsel eventually turned to questioning Sergeant Hanson about digital forensics of cell phones and social media accounts. Sergeant Hanson testified that he could not recall whether any of the suspects' social media accounts were preserved by police and that Turner's phone was not accessed despite having the passcode.

[18] On redirect, the following occurred between the State and Sergeant Hanson:

> Q. You were asked on cross about social media accounts. Why didn't you go into that in your investigation?
>
> A. After C.J. *Spearman gave the complete confession of everything*, we did not feel that we had a need to go pursue social media accounts any further at that point.

*Id*. at 110 (emphasis supplied). At a sidebar, Turner promptly objected that this was "an incredibly bad evidentiary harpoon" and requested a mistrial, noting that the defense had no opportunity to cross-examine Spearman on his statement. *Id*. at 111. Before taking a recess at the request of the State, the court stated, "I'll also note the State has been put on notice on a previous case in this court regarding these types of situations, so the State needs to be prepared to answer to that as well." *Id*. at 112.

[19] After the recess, the State argued that Sergeant Hanson's statement that Spearman gave a full confession was consistent with the defense's theory that

Spearman was the shooter, not Turner. In other words, while the State did not dispute the impropriety of the testimony, it urged that the reference to Spearman's confession did not "alone implicate[ Turner]." *Id*. at 114. The State also acknowledged that Sergeant Hanson had been warned before trial not to reference Spearman's statement.

[20] Turner, by counsel, responded by arguing that there was no satisfactory cure to the improper testimony, which violated his confrontation rights. He continued: "The State's theory is that there was a plan among these people, that there was some – some kind of coordination. A full confession on its face means that there was a confession to that plan." *Id*. at 115.

[21] The trial court denied the mistrial based on its conclusion that Sergeant Hanson's evidentiary harpoon did not rise to the level of grave peril. Particularly, the court noted that there was "other evidence tending to prove the same facts." *Id*. It went on to explain:

> I don't believe the word "full" in the confession imputes as much as [defense counsel does]. I believe that the way that [it] comes across is that … Spearman confessed to his involvement of it. I don't believe that's something that's been in doubt….
>
> The question in this case comes down to, in my mind, what's been presented I believe on both sides is whether or not [Turner] had knowledge and participated in some type of actions that contributed to [the] shooting. And so while I understand your argument, I do believe this is a close call, I don't believe that we have gotten to the point of a mistrial.

> That being said, Sergeant Hanson … this is absolutely a violation
> of the Rules of Evidence. As a sergeant in the State Police, you
> have a duty to understand those, especially when you're
> instructed by the State on what you can and can't get into. It's
> very difficult and very costly for us to do two-day jury trials that
> are mistried at the reason of an experienced police officer saying
> something they shouldn't say. So you're put on notice in regards
> to that.

*Id*. at 115-16.

[22] The parties and the court then engaged in a lengthy discussion regarding how to try to cure the error. Turner reiterated his argument that "when the State's allegation is that there's a plan, and [Spearman's] role is part of that plan, a full confession … definitely implies that that plan is part of the confession, and that – that is prejudicial here, horribly prejudicial." *Id*. at 120-21. The court disagreed that "it's gotten to grave peril," and again directed the parties to come up with a cure either through an admonishment or questioning. *Id*. at 121. Without acknowledging that it would cure the error, Turner agreed to additional questioning of Sergeant Hanson. When the cross-examination resumed, Sergeant Hanson clarified that when he said Spearman gave a full confession, he "meant to communicate" only that Spearman confessed to firing shots not "to a plan necessarily."[1] *Id*. at 127.

---

[1] The State incorrectly characterizes Sergeant Hanson's testimony following the trial court's denial of the mistrial. He did not, as the State represents, testify that Spearman confessed only to his own role in the shooting or that Spearman did not admit to having a plan with Turner. Indeed, the trial court expressly

[23] The jury found Turner not guilty of attempted battery but guilty of criminal recklessness. The trial court subsequently sentenced him to a fully suspended sentence of five years in prison, with four years of probation and the first year of probation to be served on home detention.

[24] Turner now appeals. Additional information will be provided below as needed.

## Standard of Review

[25] We review a trial court's decision whether to grant or deny a mistrial only for an abuse of discretion, as the trial court is in the best position to judge the surrounding circumstances of the event and its impact on the jury. *Knapp v. State*, 9 N.E.3d 1274, 1283-84 (Ind. 2014). A mistrial is an extreme remedy that should be granted only where other remedies cannot satisfactorily rectify the error. *Id.* at 1284. "To prevail on appeal from the denial of a motion for mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected." *Agilera v. State*, 862 N.E.2d 298, 307 (Ind. Ct. App. 2007), *trans. denied*. Gravity of peril is determined by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id.* at 307-08.

---

indicated that it would not allow such testimony. *See id.* at 119-20 (trial court explaining that the questioning could not get into the content of Spearman's confession, particularly regarding whether there was a plan).

## Discussion & Decision

[26] Turner argues that Sergeant Hanson willfully jabbed an evidentiary harpoon into the trial when he testified that Turner's co-defendant had made a *complete confession of everything*, placing him in grave peril to which he should not have been subjected. Thus, Turner contends that the only proper remedy was a mistrial and that we should remand for a new trial.

[27] An evidentiary harpoon occurs when the State deliberately places inadmissible evidence before the jury to prejudice the jurors against the defendant. *Perez v. State*, 728 N.E.2d 234, 237 (Ind. Ct. App. 2000), *trans. denied*. The harpoon may also be launched by a police officer witness. *Id.* (noting that the detective understood the significance of his improper testimony yet deliberately injected inadmissible evidence). Error alone, however, is not sufficient for reversal, as it must result in grave peril to the defendant. *Id.*

[28] Where an evidentiary harpoon has been introduced at trial, we "require a high level of assurance that the irregularity did not affect the verdict before we will affirm the judgment." *Smith v. State*, 471 N.E.2d 733, 736 (Ind. Ct. App. 1984) (quoting *Hightower v. State*, 296 N.E.2d 654, 659 (Ind. 1973)). It is not enough that the verdict is supported by sufficient evidence; we must be able to say with certainty that the improper testimony did not influence the verdict. *See White v. State*, 272 N.E.2d 312, 319 (Ind. 1971) ("[W]e cannot say with certainty that with such a difficult decision to make in the face of such conflicting testimony the jury was not influenced by the improper testimony of Officer Estes

deliberately induced by the prosecutor, notwithstanding the admonition by the trial judge to disregard it."); *Smith*, 471 N.E.2d at 736 ("[T]he evidence at trial, while sufficient to sustain Smith's conviction, was not so free from conflict as to persuade us that Officer Gersey's disputed testimony had no effect on the jury's verdict."). Our Supreme Court explained in *White*:

> The State apparently labors under the erroneous belief that in such cases as these, the burden is upon the party claiming error to conclusively demonstrate that the error caused the verdict to be what it was and that it would have been otherwise had the error not occurred. True, the burden is upon him to show that he was harmed; but this is done when it is made, by all the circumstances, to appear that the error placed him in a position of grave peril to which he should not have been subjected.

272 N.E.2d at 319-20. "Where there are serious conflicts in the evidence entitling the jury to go either way upon the issue of guilt or innocence, it is especially important that they not be subjected to improper influences." *Id*. at 319.

[29] Here, the trial court determined that the State, through Sergeant Hanson, had launched an evidentiary harpoon against Turner, and the State did not argue otherwise below.[2] That said, the trial court denied a mistrial on the basis that the error did not rise to the level of grave peril because there was other, properly

---

[2] On appeal, the State argues for the first time that the challenged testimony did not constitute an evidentiary harpoon because Sergeant Hanson did not act deliberately to prejudice Turner nor was the challenged evidence inadmissible. The trial court clearly found otherwise, and the State has not preserved these grounds for appeal. Therefore, we do not address them.

admitted evidence, tending to prove the same facts – that Spearman fired shots toward the Kia while Turner drove past the crash scene. The court expressly disagreed with Turner's argument that Sergeant Hanson's improper testimony that Spearman gave a compete confession of everything implied more than Spearman's own involvement in the shooting. The trial court also believed that the error could be cured through either an admonishment or additional questioning of Sergeant Hanson, with Turner choosing the latter.

[30] Turner argues that this case presented a close call for the jury regarding whether he knowingly or intentionally aided, induced, or caused Spearman to shoot at the Kia. He claims that Sergeant Hanson's testimony that Spearman gave a complete confession of everything was "an improper shortcut to making that showing," one likely to influence the verdict. *Appellant's Brief* at 13. Turner also notes that the testimony was elicited by the State in response to cross-examination that highlighted the lack of digital evidence of planning or coordination between himself and Spearman or the other occupants of the Ford. Indeed, Sergeant Hanson testified that police did not need to investigate the suspects' social media accounts because Spearman gave a complete confession of everything. In sum, Turner argues that even with the follow-up questioning, it was "impossible to cabin the confession to exclude Turner," as "[r]easonable jurors may have been left with the impression that Spearman really did implicate Turner in his confession, but Sergeant Hanson was not supposed to talk about it." *Appellant's Reply Brief* at 11, 12.

[31] We agree with Turner. While there was sufficient evidence here to support the verdict, as Turner concedes, the evidence of his knowledge that Spearman and Luna planned to shoot at the Kia was too weak for us to say with certainty that the improper testimony did not influence the verdict. The prejudicial impact of testimony that Turner's codefendant gave a complete confession of everything cannot be denied; it placed him in grave peril to which he should not have been subjected. And the peril was not eliminated by Sergeant Hanson's subsequent clarification that, by said testimony, he meant only to communicate that Spearman confessed to firing the shots. The jury was still left to wonder to what extent Spearman's confession implicated Turner, especially given that ISP stopped investigating Turner's social media accounts after obtaining the confession. The trial court abused its discretion in denying Turner's motion for a mistrial.

[32] Judgment reversed and cause remanded for a new trial.

Riley, J. and Pyle, J., concur.