

IN THE

# Indiana Supreme Court

Supreme Court Case No. 24S-CR-123



FILED

Apr 10 2024, 1:38 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

## Sabrina L. Dunn,

*Appellant (Defendant below)*

—v—

## State of Indiana,

*Appellee (Plaintiff below)*

Argued: February 15, 2024 | Decided: April 10, 2024

Appeal from the Orange Circuit Court
No. 59C01-2010-MR-720
The Honorable Steven L. Owen, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 22A-CR-2416

**Opinion by Justice Goff**

Chief Justice Rush and Justices Massa, Slaughter, and Molter concur.

**Goff, Justice.**

The trial court in this murder case instructed the jury that the State bore the burden of proving beyond a reasonable doubt that Sabrina Dunn did not act in self-defense "and/or" in defense of her dwelling. The same "and/or" construction appeared elsewhere in the instructions and the State echoed it in closing argument. We conclude that, on the facts of this case, the risk of jury confusion about the burden of proof rose to the level of fundamental error. Accordingly, we vacate the conviction and remand the case to the trial court.

# Facts and Procedural History

Sabrina Dunn married William "Bill" Dunn in 2005. In 2018, Bill began using methamphetamine and became erratic and abusive. Sabrina moved into a separate guesthouse on the couple's land in Paoli, Indiana, just forty or fifty yards from the main house, where Bill stayed.[1] Bill would bang on Sabrina's windows, tamper with the locks, break in, mess with her car, and threaten that she would "end up in a body bag" or find herself breathing "through a straw." Tr. Vol. V, p. 64. Bill beat Sabrina. He made her have sex with him to see their daughter (of whom he had custody) and sent her an intimate video of herself. In 2019, Sabrina obtained a protective order after Bill said he would kill her if she took their daughter. The order deemed Bill a "credible threat" to Sabrina or another member of her household and required him to "stay away" from her home. Ex. Vol. I, p. 141.

For about a year and a half leading up to Bill's death in October 2020, he and Sabrina collectively made over one hundred calls to 911. Sabrina repeatedly reported that Bill was violating the protective order. In June 2019, Bill was arrested and charged with invasion of privacy.[2] He then told Sabrina he would go to jail if she didn't have the protective order

---

[1] The Dunns' first names are used for clarity where necessary.

[2] *See* Ind. Code § 35-46-1-15.1(a)(1) (2018).

dismissed. Sabrina complied, but soon obtained another protective order (the record does not tell us on what basis). Bill's criminal case was eventually resolved by pre-trial diversion.

For a time, Sabrina lived in a trailer in French Lick, but she was ordered out because of repeated visits by police when Bill showed up to harass her. She also lived in an apartment for a while until its owner rented it out to someone else. With nowhere else to go, she moved back to the guesthouse on the property she shared with Bill. Sabrina and Bill divorced in August 2019, but the two of them continued living in the neighboring houses.

Bill's problematic behavior escalated in May 2020. The 911 calls and police visits became even more frequent. Subject to hallucinations, Bill would report that people were attacking Sabrina and plotting to kill him, and that a hostage was being held in somebody's garage. Given Bill's paranoia and mental instability, police took him to the hospital on several occasions. They twice took guns from him and retained them under court orders deeming Bill to be "dangerous."[3] Ex. Vol. II, pp. 72, 81. And while they would log Bill's unlawful contacts with Sabrina, they never arrested him again.

In September 2020, Sabrina remarked on Facebook that, if Bill tried to run her off, he should "[b]ring it on" and would need to "survive a shot gun." *Id.* at 45. By October 2020, Sabrina, out of fear of Bill, had secured her house like "Fort Knox" with deadbolts on the inside of the door and the windows screwed shut. Tr. Vol. IV, p. 5. She wanted to move out to get away from Bill. Just two weeks before Bill's death, Sabrina finally obtained, as a result of the divorce, a deed to the guesthouse, which Bill had kept from her until after she filed to hold him in contempt of court. Sabrina recorded the deed in the hope of securing title and selling the house so she could move.

---

[3] *See* I.C. § 35-47-14-6(c) (2020).

During the night of October 20–21, Bill was agitated at seeing Sabrina having sex with her boyfriend, David Wilson. Early in the morning, Sabrina was sleeping on her porch when Bill woke her up and said he wanted to get back together. They went for a drive but, according to Sabrina, Bill became agitated and threatened to kill her and Wilson. Sabrina and Bill came back home. Wilson left for work, not believing Sabrina to be in any danger as she hurried him out of the house. Sabrina then texted Wilson, criticizing him for not calling 911, although at trial Wilson denied Sabrina had asked him to do so. Sabrina asked Wilson where his gun was and fetched it.

Meanwhile, Bill set about searching the property for some lost car keys, which he suspected Sabrina had taken. Video footage from his home-security system shows him cursing and muttering threats about kicking Sabrina's door down and cutting Sabrina and Wilson in half. He apparently believed they had stolen his keys in a plot to provoke him and thus land him in jail. Eventually, he knocked on Sabrina's door and asked for his keys, but Sabrina did not open the door. He later knocked again, and he and Sabrina talked for a while. Sabrina said she didn't "want to be tortured [any] more" by the way he would alternately "push" and "pull" her. Ex. 71, Video 062647-1, 06:27:48–06:28:05. The conversation ended after Sabrina told Bill he wasn't supposed to be there and begged him to "leave [her] alone and let [her] go." *Id.* at 06:29:15–06:29:40.

An hour later, Bill returned to Sabrina's door for the last time. After knocking, he opened the door and entered the unlit house using a flashlight. Seconds after Bill went in, the videotape recorded the sounds of Sabrina racking the gun and firing seven shots. Bill wailed and Sabrina fired three more times. Bill was hit in one arm and in his torso, both front and back, fatally wounding him. Sabrina testified that Bill had picked up a "great big knife" she kept in the house and that she feared he was going to kill her. Tr. Vol. V, p. 90. She called 911 and admitted shooting Bill. Police and EMS responded but Bill was pronounced dead at the scene. Police recovered from Bill's person two knives, a lockpicking kit, and suspected methamphetamine. They found a third knife under his body. His autopsy showed moderate methamphetamine toxicity.

The State charged Sabrina with murder.[4] At trial, defense counsel argued that Sabrina justifiably used deadly force in defense of her dwelling. The State argued, conversely, that Sabrina had lain in wait for Bill and killed him according to a plan, rather than out of reasonable necessity.

After the close of evidence, the trial court decided of its own accord to instruct the jury on self-defense as well as defense of dwelling. Sabrina's counsel objected to any instruction on self-defense, arguing that the evidence had not placed it at issue. The trial court overruled the objection and, following closing arguments, gave Final Instruction 7. This instruction stated that it was "an issue whether the Defendant acted in self-defense and/or in defense of her dwelling." App. Vol. III, p. 194. The instruction then defined the elements of each defense before specifying that the State had "the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense and/or act in defense of her dwelling or land adjoining her dwelling." *Id.* The jury found Sabrina guilty of murder and the trial court sentenced her to the maximum sixty-five-year term.[5]

The Court of Appeals affirmed the conviction, holding that Sabrina had waived her challenge to the "and/or" wording of Final Instruction 7 and that no fundamental error occurred because the instructions as a whole did not mislead the jury. *Dunn v. State*, No. 22A-CR-2416, 2023 WL 5425145, at *5–6 (Ind. Ct. App. Aug. 23, 2023). However, the panel reviewed her sentence under Indiana Appellate Rule 7(B) and revised it to fifty-five years with five years suspended. *Id.* at *7.

---

[4] *See* I.C. § 35-42-1-1(1) (2018).

[5] While the jury deliberated, two jurors sent notes to the court. One note said a juror had made a statement that "did not pertain to the case," put his finger in the note-writer's face, and told him or her to "stop talking." App. Vol. III, p. 208. The other note attested to "bias in the case." *Id.* at 210. By agreement of the parties, the trial court told the jury to re-read its instruction on how to deliberate and to "conduct themselves in [an] appropriate and dignified manner." *Id.* at 211.

We now grant transfer, vacating the Court of Appeals' decision. *See* Ind. Appellate Rule 58(A).

# Standards of Review

A claim of error in instructing a jury is usually reviewed for abuse of discretion. *Miller v. State*, 188 N.E.3d 871, 874 (Ind. 2022). When the defendant "fails to object," however, she "waives appellate review." *Id.* Still, we may review an instruction for fundamental error under a "narrow exception to waiver." *Id.* An error is fundamental if it "made a fair trial impossible" or constituted a "clearly blatant violation of basic and elementary principles of due process that presented an undeniable and substantial potential for harm." *Id.* (cleaned up). In evaluating the degree of error and its impact on the trial, we take account of any "unusual operative and procedural facts" affecting the case. *See Young v. State*, 30 N.E.3d 719, 728 (Ind. 2015).

# Discussion and Decision

This opinion proceeds in two parts. First, we explain that fundamental-error review applies because Dunn did not specifically object to the "and/or" language that she now raises as error. Second, after considering the instructions as a whole and the unusual facts of the trial, we conclude that the language describing the State's burden of proof on Dunn's defenses was so misleading as to produce fundamental error.

## I. Dunn waived her challenge to the instructional language.

Dunn's appeal focuses on the language of Final Instruction 7. The applicable standard of review depends on whether the issue was properly preserved at trial.

Counsel for Dunn objected to the jury being instructed on self-defense, arguing that "the only evidence" presented at trial related to "entry into"

Dunn's home. Tr. Vol. V, p. 125. Counsel did not object to the "and/or" language now identified as error. Indiana Trial Rule 51(C) provides that a party preserves an instructional error for appeal by objecting to it before the jury retires, "stating distinctly the matter to which he objects and the grounds of his objection." Appellate review is thus waived absent a "specific objection." *Scisney v. State*, 701 N.E.2d 847, 848 (Ind. 1998) (citing *Smith v. State*, 565 N.E.2d 1059, 1061 (Ind. 1991); *Harvey v. State*, 546 N.E.2d 844, 846 (Ind. 1989)). This rule enables the trial court to "avoid error" and "facilitate[s] appellate review." *Id.* And, here, it means Dunn's challenge was waived.

Review is thus available only if the claimed error was fundamental. Dunn can prevail only if the jury charge as a whole "was so misleading as to make a fair trial impossible or blatantly violate basic due process." *Knapp v. State*, 9 N.E.3d 1274, 1285 (Ind. 2014).

## II. Fundamental error occurred.

We review Dunn's instructional issue for fundamental error in two steps. We begin by explaining why the use of "and/or" in Final Instruction 7 was ambiguous and misleading. We then address whether, in view of the entire trial, the instructions rendered Dunn's proceedings unfair and subjected her to a substantial and undeniable risk of harm. We conclude that Dunn's challenge meets this high bar and merits a rare exception for relief on an otherwise waived claim.

### A. Final Instruction 7's use of "and/or" was ambiguous and misleading.

The criminal code provides a number of justifications for the use of force. Two matter here: defense of self and defense of dwelling. A person "is justified in using deadly force" and has no "duty to retreat" if "the person reasonably believes that that force is necessary to prevent serious bodily injury to the person" or "the commission of a forcible felony." Ind. Code § 35-41-3-2(c) (2019). A person is also "justified in using reasonable force, including deadly force," if "the person reasonably believes that the

force is necessary to prevent or terminate the other person's unlawful entry of or attack on the person's dwelling, curtilage, or occupied motor vehicle." I.C. § 35-41-3-2(d).

The essential point the jury needed to understand here was that Sabrina Dunn's use of deadly force was justified if she reasonably believed it was necessary to defend either herself **or** her dwelling. *See Birdsong v. State*, 685 N.E.2d 42, 45 (Ind. 1997) (stating that "one may use deadly force if he reasonably believes that such force is necessary to defend himself **or** his property") (emphasis added). It was the State's burden to prove beyond a reasonable doubt "that the defendant's use of force was not justified." *Id.*[6] Because the trial court determined that self-defense **and** defense of dwelling were potentially at issue, the State had to disprove **both** justifications to obtain a guilty verdict. The trial court informed the jury in Final Instruction 7, however, that the State had to prove Dunn "did not act in self-defense **and/or** act in defense of her dwelling." App. Vol. III, p. 194 (emphasis added).

The phrase "and/or" has excited much debate. A recent commentator believes that a well-placed "and/or" is "a strong, cogent, and efficient signal of flexibility." Ira Robbins, *"And/Or" and the Proper Use of Legal Language*, 77 Md. L. Rev. 311, 313 (2018). The majority of opinion is critical, however. Courts have labeled "and/or" a "verbal monstrosity," an "abominable invention," and worse. *See State v. Gonzalez*, 130 A.3d 1250, 1255 (N.J. Super. Ct. App. Div. 2016) (citing cases). One style guide advises: "To avoid ambiguity, don't use it." Bryan A. Garner, Garner's Modern English Usage 50 (4th ed. 2016). A classic work on legal language labels it "the repeated and direct cause of uncertainty, litigation, and courtroom failure." David Mellinkoff, The Language of the Law 307

---

[6] In some jurisdictions, the defendant must affirmatively establish self-defense by a certain quantum of proof. Jeffrey F. Ghent, Annotation, *Homicide: Modern Status of Rules as to Burden and Quantum of Proof to Show Self-Defense*, 43 A.L.R.3d 221 § 2(a) (1972). Indiana's rule placing the burden on the State to disprove self-defense beyond a reasonable doubt is longstanding. *Johnson v. State*, 256 Ind. 579, 581–83, 271 N.E.2d 123, 124–25 (1971); *Martin v. State*, 28 Ind. 310, 311, 312 (1867).

(1963). If "and/or" has a proper use, it is to signify "A or B, or both." Robbins, *supra*, at 315. But it is clearer to spell the matter out in full, as the latter wording does.

We warn against using "and/or," especially in jury instructions, because it is ambiguous and potentially imprecise. Where wording permits "two contradictory interpretations, one correct and one erroneous," the jury may be misled as to the law. *LaPorte Community School Corp. v. Rosales*, 963 N.E.2d 520, 525–26 (Ind. 2012). Even commentators who defend the use of "and/or" find it unsuitable for jury instructions in cases involving "more than one person, victim, or element." Robbins, *supra*, at 320. And courts have reversed judgments where "and/or" rendered a jury charge ambiguous. *See, e.g., Gonzalez*, 130 A.3d at 1258, 1259 (where the defendant conspired in or acted as accomplice to robbery "and/or" aggravated assault); *Harris v. State*, 937 So.2d 211, 212 (Fla. Dist. Ct. App. 2006) (where the defendant "and/or" his co-defendant killed the victim). While we do not lay down a bright-line rule that instructing a jury using "and/or" is always error, we strongly caution trial courts to avoid this troublesome phrase.

Here, the presence of "not" in Final Instruction 7 rendered "and/or" even more ambiguous than usual. The jury needed to understand that the State had to prove Dunn did **not** act in either self-defense **or** in defense of her dwelling. But Final Instruction 7's inclusion of an "and" option opened the door to confusion, suggesting that the State bore the burden of proving only that Dunn did **not** act in **both** self-defense **and** defense of her dwelling. Or, to put it another way, the jury may have understood Final Instruction 7 as giving the State the burden of disproving either self-defense **or** defense of dwelling, rather than both. This possibility rendered the instruction ambiguous and raises the specter of conviction without proof beyond a reasonable doubt of Dunn's guilt.

We next evaluate the magnitude of the error caused by Final Instruction 7's language and its impact on the outcome of Dunn's trial.

## B. The misleading jury instructions produced fundamental error in the context of this trial.

Several considerations convince us that the ambiguous Final Instruction 7 deprived Dunn of a fair trial. As we explain below, the instructional ambiguity was reiterated rather than cured, it impaired Dunn's defense strategy, and there is a real chance the jury was misled into convicting her.

### 1. Neither the jury charge nor the arguments of counsel cured the ambiguity of Final Instruction 7.

We review jury instructions "'as a whole and in reference to each other.'" *Knapp*, 9 N.E.3d at 1284–85 (quoting *Whitney v. State*, 750 N.E.2d 342, 344 (Ind. 2001)). An error is reversible only if "'the entire jury charge misleads the jury as to the law in the case.'" *Id.* (quoting same). On fundamental-error review, we also consider whether the statements of counsel might have clarified and corrected the jury's understanding. *See id.* at 1286; *Boesch v. State*, 778 N.E.2d 1276, 1280 (Ind. 2002).

Here, the instructions as a whole failed to remedy the ambiguity introduced by Final Instruction 7. Indeed, the problematic phrase "and/or" appeared again in Final Instruction 8. The latter instruction told the jury that the "self defense and defense of dwelling statute" required (in part) that Dunn have a "subjective belief" that her force was "necessary" and "appropriate" to "prevent serious bodily injury **and/or** unlawful entry upon her dwelling." App. Vol. III, p. 195 (emphasis added). Again, the inclusion of "and" sowed ambiguity, obscuring the fact that either of the two justifications would negate Dunn's guilt.

The instructions nowhere told the jury that the State needed to disprove both defenses. Consequently, we find it hard to assume that the jury realized it should read the ambiguous "and/or" construction as "or" in both Final Instructions 7 and 8. *Cf. Garzon v. State*, 980 So.2d 1038, 1040, 1044–45 (Fla. 2008) (finding no fundamental error where one instruction set out the elements of the charges as to each defendant "and/or" their co-defendants, but another instruction told the jury "to consider each defendant individually").

Furthermore, the State explained to the jury in closing argument that the court's instructions would say it was "an issue whether the defendant acted in self-defense **and or** [*sic*] in defense of her dwelling." Tr. Vol. V, p. 181 (emphasis added). The State thus reiterated—rather than clarified—the ambiguous burden of proof, infecting the most critical issues in the case. Although the State also conceded to the jury that it bore the "burden to overcome" the "castle doctrine," this statement was not explicit enough to reassure us that the jury understood it. *See id.*

Granted, defense counsel argued in closing that, in asserting defense of dwelling, Dunn did not need "a reasonable belief that [her] life [was] in danger." *Id.* at 163. Counsel made a similar point in his opening statement too. These comments might have imparted an accurate notion of the law. However, the jury was told that the "Court's instructions are your best source in determining the law." *Id.* at 185. And the instructions were the last thing the jury heard before retiring to deliberate. We presume that the jury perceived the "special and crucial character" of the court's instructions relating to the State's burden of proof. *Abdul-Wadood v. State*, 521 N.E.2d 1299, 1300 (Ind. 1988). Ultimately, we lack confidence that defense counsel's statements, offered in the course of arguments on Dunn's behalf, effectively corrected the ambiguity subsequently introduced and repeated by both the trial court and the State. *Cf. Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (noting as "particularly apt" the inference that a jury will credit a "*prosecutor's* argument that resolves an ambiguity in favor of the *defendant*"); *Knapp*, 9 N.E.3d at 1286 (noting that the State quickly and candidly corrected an error in a preliminary instruction, without contradiction by the defense); *Garzon*, 980 So.2d at 1044 (noting that the trial court and both sides' counsel repeatedly explained the relevant law correctly).

### 2. The trial court's instructions impaired the defense's trial strategy.

The particular context in which the challenged instruction was given bolsters our finding of fundamental error. Dunn approached the case, presumably for strategic reasons, with defense of dwelling as her sole

answer to the charge of murder. Defense counsel's opening statement set out his strategy in clear, albeit overstated, terms: "If there is an unlawful entry into your house you can shoot 'em." Tr. Vol. III, p. 77. The defense opposed any instruction on self-defense, which the trial court gave of its own accord. While we appreciate the trial court's concern to instruct the jury on self-defense—which was plainly an issue within the evidence presented at trial—particular care was needed when drafting instructions sua sponte, over an objection, after the close of evidence, and contrary to the express strategy of the party whom the instructions were supposed to protect. And it's especially important to avoid ambiguity when trying the most serious crimes bearing the highest penalties. *See Richeson v. State*, 704 N.E.2d 1008, 1011 (Ind. 1998) (noting the severe consequences of jury confusion in an attempted-murder trial). In these unusual circumstances, we conclude that the ambiguous instructions so confused the burden of proof on Dunn's chosen defense as to impair the fairness of the adversarial process.

### 3. The strength of Dunn's defense leaves us fearing that the misleading instructions affected the outcome.

Finally, we find undeniable potential for harm here because Dunn presented such a strong case for her defense-of-dwelling justification. *See Metcalfe v. State*, 715 N.E.2d 1236, 1237 (Ind. 1999) (finding fundamental error where the instructions misstated the mens rea for attempted murder and the defendant's "intent was very much open to debate").

The jury heard the following evidence in support of Dunn's defense of her dwelling. Bill Dunn had a history of breaking into Sabrina Dunn's house and tampering with the locks. Even when Sabrina obtained protective orders barring Bill from approaching her and her home, he violated them over and over. Sabrina testified that the police would habitually log Bill's violations without arresting him. According to Sabrina, one officer told her he was tired of coming out to her place. Bill's delay in signing over the deed to Sabrina's house prevented her from moving out. He was mentally unstable and had methamphetamine in his system that fatal morning. The jury saw on videotape that Bill was

obsessed with finding lost car keys that he believed Sabrina and her boyfriend had taken to mess with him. In the hours leading up to his death, Bill had threatened to kill Sabrina and Wilson, muttered about kicking her door down and cutting them in half, and twice knocked on her door. The second time he knocked, Sabrina came out and explained at length why she wanted to be free of him and "tortured no more." Ex. 71, Video 062647-1, 06:27:18–06:29:15. She ended by telling him he needed to leave, her voice quivering with emotion. Finally, after knocking a third time, Bill entered the darkened house using a flashlight and carrying knives.

In sum, Bill interfered incessantly with Sabrina's life, repeatedly broke into her home, and constantly harassed her in the face of pleas and protective orders. He entered her home uninvited in the dark after she begged him to stay away. The jury could have concluded that Sabrina reasonably believed nothing short of gunfire would terminate Bill's trespass into her dwelling.

In making this determination, we do not disregard the State's argument that Sabrina had no real need to shoot Bill. The evidence could be interpreted in the State's favor as showing that Sabrina deliberately rushed Wilson out of the house, left her door unlocked, waited to shoot Bill if and when he entered, and then shot him over and over without first demanding he get out. What's more, there was conflicting evidence as to whether Bill was carrying a knife in his hand. And the knife found under Bill's body was not the same one Sabrina told police he was carrying, which raised questions over where it came from.

It was undoubtedly the jury's prerogative to evaluate the credibility of the witnesses, weigh the evidence, and resolve any conflicts. *Young v. State*, 198 N.E.3d 1172, 1176 (Ind. 2022). But the jury could properly do so only if equipped with the correct legal standard. Quite simply, the plausibility of Sabrina Dunn's defense-of-dwelling claim compels us to conclude that the misleading jury charge might have determined the outcome of the trial.

* * *

The ambiguous, repeated, and uncured use of "and/or" to instruct the jury on the State's burden of proof impaired the sole defense strategy Dunn pursued throughout the trial. Because Dunn's defense had a strong basis in the evidence, we conclude there is a serious risk she was wrongly convicted without the State disproving beyond a reasonable doubt that she acted in defense of her dwelling. On these "unusual operative and procedural facts," we find that fundamental error undermined the fairness of her trial. *See Young*, 30 N.E.3d at 728.

## Conclusion

For the reasons stated, we vacate Dunn's murder conviction and remand the case to the trial court for further proceedings.[7]

Rush, C.J., and Massa, Slaughter, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT
Robert G. Bottorff II
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Kathy J. Bradley
Ian A.T. McLean
Office of the Attorney General
Indianapolis, Indiana

---

[7] Because we vacate Dunn's conviction, we do not review her claim for a sentence revision under Indiana Appellate Rule 7(B).